**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 22-20201-CV-GAYLES/TORRES

BANCOR GROUP INC., and
STITCHING PARTICULIER FONDS
FRANEKER, derivatively on behalf of
EASTERN NATIONAL BANK, N.A.,

     *Plaintiffs*,

v.

GABINA RODRIGUEZ,
LOUIS FERREIRA,
CESAR GOMEZ VALERO,
KEITH PARKER,
CARLOS RODRIGUEZ, and
GUSTAVO MACIAS,

     *Defendants.*

_____/

**REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTION TO DISMISS**

This matter is before the Court on Defendants' motion to dismiss Plaintiffs'
complaint. [D.E. 21]. Plaintiffs responded to Defendants' motion on April 4, 2022,
[D.E. 37], to which Defendants replied on April 20, 2022 [D.E. 48]. Therefore,
Defendants' motion is now ripe for disposition. After careful consideration of the
complaint, briefing, relevant authority, and for the reasons discussed below,
Defendants' motion to dismiss should be **DENIED**.[1]

---

[1]    On January 21, 2022, the Honorable Darrin P. Gayles referred Defendant's
motion to dismiss to the undersigned Magistrate Judge for disposition. [D.E. 9].

## I.  BACKGROUND

### A.    *A brief introduction to the sanctions against Venezuela.*

On March 8, 2015, the President of the United States of America signed Executive Order 13692 and therein stated:

> I, BARACK OBAMA, President of the United States of America, find that the situation in Venezuela, including the Government of Venezuela's erosion of human rights guarantees, persecution of political opponents, curtailment of press freedoms, use of violence and human rights violations and abuses in response to antigovernment protests, and arbitrary arrest and detention of antigovernment protestors, as well as the exacerbating presence of significant public corruption, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States, and I hereby declare a national emergency to deal with that threat.

Executive Order 13692 then proceeded to impose a panoply of sanctions, including but not limited to blocking the transfer of certain assets within the United States, against the Venezuelan government and its collaborators.

Following a peaceful transition of power, the Executive Branch did not retreat from its condemnation of the Venezuelan government.  On August 24, 2017, the newly elected President signed Executive Order 13808, which stated:

> I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015, and particularly in light of recent actions and policies of the Government of Venezuela, including serious abuses of human rights and fundamental freedoms; responsibility for the deepening humanitarian crisis in Venezuela; establishment of an illegitimate Constituent Assembly, which has usurped the power of the democratically elected National Assembly and other branches of the Government of Venezuela; rampant public corruption; and ongoing repression and persecution of, and violence toward, the political opposition, hereby order [additional sanctions].

With the passage of time, the sanctions imposed against the Venezuelan government and its collaborators became only more comprehensive. *See, e.g.*, Executive Order 13835 of May 21, 2018; Executive Order 13884 of August 5, 2019. The rationale for these executive actions is relatively intuitive: the sanctions are designed to make the violence and corruption in Venezuela financially unsustainable for the responsible parties.

### B.   *The factual allegations in the complaint.*

The complaint as a whole alleges a plausible account of a conspiracy to evade the executive sanctions discussed above, which we summarize below.

#### 1.   *The Bank and other relevant parties.*

*Eastern National Bank, N.A.* (the "Bank") is a national banking association authorized to do business in the State of Florida.  Its principal offices are in Miami-Dade County, Florida.

*Mercorp, N.V.* ("Mercorp") is a company organized under the laws of Curaçao. Mercorp owns more than 99% of the Bank's shares.

*Corpofin, C.A.* ("Corpofin") is a company organized under the laws of Venezuela.  Corpofin is the sole owner of Mercorp.  Additionally, since the 1990s, Corpofin has been controlled by the Venezuelan government by virtue of Corpofin's placement in an administrative receivership relating to a debt owed by Corpofin to an agency of the Venezuelan government.

3

*Gabina Rodriguez* ("Gabina") is an agent of Venezuelan government.  In 2009, Gabina was appointed by the Venezuelan government as the receiver for Corpofin.[2] Her government-appointed control over Corpofin provides her with full control over Mercorp, which in turn effectively makes her the Bank's majority shareholder. From 2015 to 2021, Gabina also served as Chairwoman of the Bank's board of directors. She is a resident of Caracas, Venezuela.

*Cesar Gomez Valero* ("Gomez") served as a member of the Bank's board of directors from 2015 to 2021. He is also a resident of Caracas, Venezuela.  And, based upon a review of the record, he is the only Defendant who has not yet been served with process in this lawsuit.

*Keith Parker* ("Parker") has served on the Bank's board of directors since 2005. He is a resident of Miami-Dade County, Florida.

*Gustavo Macias* ("Macias") has served on the Bank's board of directors since 2016.  He is a resident of Miami-Dade County.

*Louis Ferreira* ("Ferreira") is the Bank's current President and CEO, which is a role that he has occupied since 2020.  Ferreira has also been a member of the Bank's board of directors since 2019.  He is a resident of Broward County, Florida.

*Carlos Rodriguez* ("Rodriguez") was the Bank's President and CEO from 2018 to 2020.  Carlos has also served on the Bank's board of directors since 2016.  He is a resident of Miami-Dade County, Florida.

---

[2]     Gabina appears to concede in her motion to dismiss that this appointment qualifies her as a "public official" under Venezuelan law.  [D.E. 21 at 11].

*Edward Holden* ("Holden") has served on the Bank's board of directors since 2021.  He is the only current member of the board who is not named as a Defendant, and he is the only "independent" director identified by Plaintiffs.  Collectively, therefore, the Bank's current board of directors includes Holden, Rodriguez, Ferreira, Macias, and Parker.

*Bancor Group Inc.* ("Bancor") is a company organized under the laws of the State of Florida.  Its principals include Juan Santaella and Juan B. Santaella.  Bancor owns 63 shares of stock in the Bank.

*Stitching Particulier Fonds Franeker* ("Franeker") is a company organized under the laws of Curaçao.  Its principals include Juan Santaella and Juan B. Santaella.  Franeker owns 22 shares of stock in the Bank.  Bancor and Franeker, as the "Minority Shareholders," filed this derivative action.

### 2.      *The Bank's relationship with Banco de Venezuela.*

In 2017, after all United States banks closed their correspondent relationship with the state-owned Banco de Venezuela ("BV"), the Bank opened and operated an account for BV.  Notably, during her tenure as Corpofin's receiver, Gabina also served as an Executive Vice President for BV's Legal Department from 2011 to 2012.

Before opening the BV account, the Bank sought an advisory opinion from one of its regulators, the Office of the Comptroller of the Currency of the United States ("OCC"), regarding the opening of such an account.  In response, the OCC advised the Bank of the risks involved and reminded the Bank of its obligation to ensure that it was prepared to manage such a "high-risk" account without violating the applicable

laws.  But the Bank failed to meet its obligations with respect to some transactions relating to BV account, which caused the OCC to initiate an investigation into the Bank's practices in 2018.

### 3.   *The Bank's financial and regulatory troubles.*

In October 2018, the OCC issued, with the consent of the Bank's board of directors, an order that noted multiple deficiencies in the Bank's practices, including its failure to adequately comply with the Bank's anti-money laundering and Bank Secrecy Act obligations with respect to the BV account (the "2018 Consent Order"). Specifically, the OCC identified ten risky account relationships for which there was insufficient customer due diligence information.

The 2018 Consent Order imposed numerous obligations on the Bank designed to remedy the identified deficiencies in its banking practices.  At that time, the Bank's board of directors consisted of Gabina, Gomez, Macias, Parker, and Rodriguez.  Then, in October 2019, Ferreira joined the Bank's board of directors; in March 2020, he replaced Rodriguez as the Bank's President and CEO.  Despite the change in the board's composition, the Bank failed to take appropriate actions to remedy the deficiencies identified by the OCC in 2018, 2019, or 2020.[3]  This failure caused the OCC, again with the consent of the Bank's board of directors, to issue a second order in November 2020 (the "2020 Consent Order").

---

[3]     The Minority Shareholders allege that, during this time, they repeatedly asked to meet with the Bank's board of directors for the purpose of addressing the Bank's compliance issues, but these requests were denied.  Notably, the Bank also failed to hold a shareholder meeting in 2018, 2019, and 2020, even though such meetings were required by the Bank's Articles of Incorporation and By-laws.

The 2020 Consent Order found that the Bank failed to attain compliance with the 2018 Consent Order.  Moreover, it found that new "unsafe" and "unsound" banking practices existed and that the bank was in a "troubled condition."  Put differently, the OCC believed that things at the Bank were getting worse instead of better.  In sum, as a result of the Bank's mismanagement and its failure to comply with the dictates of the OCC, the Bank incurred losses of roughly $20,000,000.00 between 2018 and 2020.  Accordingly, the 2020 Consent Order imposed an array of new obligations on the bank, including the requirements that the Bank add at least two "independent, outside directors" to its board, maintain certain capital ratios, and submit an "acceptable written Capital and Strategic Plan for the Bank" to the OCC.

Following the issuance of the 2020 Consent Order, the Minority Shareholders continued to request to meet with the Bank's board of directors to help address the Bank's ongoing compliance issues.  Again, the requests were denied.  Consequently, after a written demand requesting the inspection of certain corporate records was largely rejected by the Bank's board of directors, the Minority Shareholders filed a lawsuit in the Southern District of Florida to force the board's compliance with its own rules.  The lawsuit ended in a joint stipulation of dismissal without prejudice. Nevertheless, from the issuance of the 2020 Consent Order to the present, the Bank's board of directors allegedly failed to take reasonable steps toward compliance with the mandates of the OCC, which in turn increased the likelihood that the Bank will be subject to serious penalties, financial and otherwise, resulting from a regulatory enforcement action.  Indeed, it has been more than one year since the issuance of the

2020 Consent Order and the Bank has still neglected to add two independent directors to its board. This is despite Gabina and Gomez's forced removal from the board, which resulted from the OCC's revocation of their residency waivers in March 2021.

### 4.    The Bank's equity compensation scheme.

Against this backdrop of consecutive OCC investigations and multi-million-dollar losses, the Bank's board of directors considered and implemented a policy to increase their compensation. Specifically, in 2018, the Bank's board of directors established an equity incentive plan to provide for the issuance of restricted stock units to themselves and others (the "RSU Plan").

The stated purpose of the RSU Plan was to attract and retain qualified directors and employees. The board had the authority to propose the RSU Plan, however, a shareholder vote was required for ratification because such a plan would dilute shareholder value. But Gabina, Gomez, Macias, Parker, and Rodriguez – the Bank's board of directors at the time the RSU Plan was established – never held a shareholder vote. Indeed, from 2018 until December 2021, the Bank did not hold an annual shareholder meeting as required by the Bank's governing documents. Instead, recognizing that more than 99% of the Bank's shares were effectively held by Gabina, the Bank established the RSU Plan without the input of the Minority Shareholders. And so, between December 2018 and July 2019, the RSU Plan caused about 16% of the Bank's shares to be issued to Gabina, Gomez, Macias, Parker, and

Rodriguez.  Ferreira, who joined the Bank in October 2019, also stands to benefit under the RSU Plan.

In reality, the Minority Shareholders allege, the RSU Plan is a *quid pro quo* agreement between Gabina and the Bank's board of directors, to wit: the equity distributed by the RSU Plan compensates the Bank's board of directors for its willingness to permit Gabina – and thus the Venezuelan government – to continue to exert absolute control over the Bank.

    **5.**  ***The Bank's licenses to avoid certain Venezuelan sanctions.***

To reiterate, the United States government has imposed significant sanctions against the Venezuelan government through the issuance of a series of executive orders.  In response to those sanctions, the Bank obtained licenses from the Office of Foreign Assets Control ("OFAC") to engage in certain transactions with Venezuelan entities and individuals that would otherwise be prohibited by presidential fiat.

The Minority Shareholders allege that, to obtain these OFAC licenses, the Bank made certain misrepresentations to OFAC relating to Gabina's relationship with the Venezuelan government.  More specifically, the Bank's board of directors caused the Bank to inform OFAC that Gabina makes all decisions regarding Corpofin (and thus Mercorp) independent from the Venezuelan government.  But, as discussed above, the complaint sufficiently alleges that Gabina is not so independent.

    **6.**  ***The Bank's shareholder meeting in December 2021.***

On December 1, 2021, the Bank noticed its first annual shareholder meeting in roughly four years.  On the agenda for the December 17, 2021, meeting was the

election of the Bank's board of directors and an amendment to the Bank's governing documents that would permit an increase in the number of authorized shares of common stock in the bank.[4]

In defiance of the 2020 Consent Order, however, only one new "independent" director was nominated to the Bank's board of directors: Holden.  The remaining nominees – Ferreira, Parker, Rodriguez, and Macias – were already on the board at the time the 2020 Consent Order was issued.  The proposed board composition was therefore non-compliant with the 2020 Consent Order because it failed to include two "independent" directors.

At the December 17, 2021, shareholder meeting, the election of the board of directors was not without incident.  Indeed, after the Minority Shareholders, who were acting as two of the three "election judges" at the meeting, repeatedly objected to a board composition that was not compliant with the 2020 Consent Order, they were "forcibly removed" from their positions as election judges.  And in defense of this removal, Ferreira, Parker, Rodriguez, and Macias – all of whom were subsequently re-elected to the Bank's board of directors – explained that the OCC waived its two-independent-director requirement after the 2020 Consent Order was issued because

---

[4]     The increase in stock was related to the Bank's efforts to recapitalize the Bank and thereby attempt to bring the Bank into compliance with the 2020 Consent Order. Notably, it appears that the intended capital infusion was to come from Venezuelan entities and/or individuals whose investments in the Bank would have been precluded but for the exception granted in the Bank's OFAC licenses.  One of the items that was not discussed at the December 17, 2021, shareholder meeting was a $15,000,000.00 capitalization offer from an independent investor that would have, at least theoretically, eliminated the Bank's need to obtain recapitalization funds from Venezuelan entities and/or individuals through the use of the Bank's OFAC licenses.

finding the second director presented an obstacle to the Bank's recapitalization efforts. This explanation, which directly contradicts an express obligation imposed by one of the Bank's regulators, was not substantiated by any documentation.

### C. *Inferences drawn from the complaint.*

Based on the factual allegations in the complaint, and in the light most favorable to the non-moving parties, some inferences can be drawn as to what is at issue in the case. Say, as Plaintiffs accuse, you are an authoritarian Venezuelan President operating a criminal enterprise under color of law. If so, you recognize that the human rights abuses you committed or endorsed during your rise to power may come back to haunt you. Indeed, your incumbency may only precipitate your clandestine exit from the country. Such exits are expensive. So, it is probably prudent to have a financial "go-bag" as they say. But you shouldn't have a literal go-bag for all of your wealth; it's far too risky to put all of your eggs in one basket. A wise autocrat is a diversified autocrat. And so, you start acquiring assets in foreign countries that are presumably more stable than the authoritarian country you rule. Note, however, that you will eventually need to be able to access (or liquidate) and transfer those assets to wherever you plan on hiding after your fall from power.

But what about all of that wealth you've stored in your country? You must plan to extract that wealth when you need it just in case the other assets in your portfolio suddenly become inaccessible. And surely there must be holes in the international banking system that will permit you to sneak the value of those assets abroad. *For this, you need to find the right banker.* That is the first inference.

The second inference is that Gabina may be the "right banker" in the eyes of the Maduro Regime.

And the third logical inference is that the Bank's board of directors is too lazy and/or complicit to stop Gabina from providing the Venezuelan government with a vehicle to surreptitiously import Venezuelan assets into the United States.

To reiterate, our Executive Branch has repeatedly and unequivocally found that the Venezuelan government is corrupt, illegitimate, and responsible for grotesque violations of human rights.   In fact, the Venezuelan government "constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States." *See* Executive Order 13692 of March 8, 2015; Executive Order 13808 of August 24, 2017; Executive Order 13835 of May 21, 2018; Executive Order 13884 of August 5, 2019.  Our review of this complaint cannot ignore this legal context.

As a result, the factual allegations in this complaint are thus entirely plausible. Here, the core allegation is that the Bank's board of directors engaged in a *quid pro quo* scheme with Gabina wherein the directors received compensation for allowing the Venezuelan government to control the Bank – an entity that is capable of (and has been scrutinized for) laundering Venezuelan assets through the United States banking system.  This core allegation, which we must assume to be true for purposes of a motion to dismiss, infects and informs the balance of the Minority Shareholders breach allegations.   It helps explain, for example, why the Bank was cited for numerous "unsafe" and "unsound" banking practices.  And with that in mind, the

Court must evaluate whether the Minority Shareholders have sufficiently alleged that the Bank's board of directors violated their fiduciary duties of care and loyalty by essentially allowing the Bank to become another corrupt agency of the Venezuelan government.

## II.   APPLICABLE PRINCIPLES AND LAW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for failure to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Conclusory statements, assertions or labels will not survive a Rule 12(b)(6) motion to dismiss. *Id*.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.; *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard).  "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citation omitted).  Additionally:

> Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  In evaluating the sufficiency of a plaintiff's pleadings, we make reasonable inferences in Plaintiff's favor, "but we are not required to draw plaintiff's inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).  Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations. *Id*.; *see also*

*Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

*Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1260 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449, 453 n.2 (2012). The Eleventh Circuit has endorsed a "two-pronged approach" in applying these principles: (1) eliminate any allegations in the complaint that are merely legal conclusions; and (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (internal quotations omitted).

### III.   ANALYSIS

Defendants seek to dismiss the complaint for several reasons. First, Defendants argue that Plaintiffs' pre-suit demand was insufficiently made and is insufficiently alleged in the complaint. Second, Defendants argue that the complaint fails to sufficiently allege a cause of action for either the breach of the fiduciary duty of care or the breach of the fiduciary duty of loyalty. And third, Defendants argue that the business judgment rule bars Plaintiffs' claims. Each argument will be explored in turn; however, all are unpersuasive at this stage of the case.

### A.   *The demand requirement should be excused as futile.*

Defendants eagerly note on page one of their motion to dismiss that the Minority Shareholders own a collective 85 shares of stock in the bank, which represents less than 1% of the issued shares. But it takes then them six pages to acknowledge the Minority Shareholders' futility allegations. In the intervening

pages, Defendants spill considerable ink arguing that the Minority Shareholders either failed to make a sufficient pre-suit demand on the board or failed to sufficiently allege said demand in the complaint. These arguments, however, fail to appreciate what the complaint unambiguously alleges: it would have been futile for the Minority Shareholders to make a demand on the Bank's board of directors if that demand bore some relationship to the alleged *quid pro quo* scheme.

Florida law requires that, as a condition precedent to bringing a shareholder derivative action, the shareholder must demand that the board of directors take the desired action or otherwise provide a sufficient explanation for why making such a demand would be futile. *See* Fla. Stat. § 607.0742; *Rappaport v. Scherr*, 322 So. 3d 138, 144 n. 7 (Fla. 3d DCA 2021). Similarly, the Federal Rules of Civil Procedure impose heightened pleading requirements relative to this demand requirement. *See* Fed. R. Civ. P. 23.1 ("The complaint must be verified and must . . . state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."). Florida courts have turned to Delaware law for guidance in the shareholder derivative suit context, making Delaware case law relevant to the instant case. *See First American Bank and Trust v. Frogel*, 726 F. Supp. 1292, 1298 (S.D. Fla. 1989).

The Delaware Supreme Court recently adopted a three-part "universal" test for assessing whether demand should be excused as futile. *United Food &*

*Commercial Workers Union & Participating Food Indus. Employers Tri-State Pension*

*Fund v. Zuckerberg*, 262 A.3d 1034, 1058-59 (Del. 2021).  According to that test:

> [C]ourts should ask the following three questions on a director-by-director basis when evaluating allegations of demand futility:
>
> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.
>
> If the answer to any of the questions is "yes" for at least half of the members of the demand board, then demand is excused as futile.

*Id*. at 1059.

Because the purpose of the demand-futility analysis is "to assess whether the board should be deprived of its decision-making authority because there is reason to doubt that the directors would be able to bring their impartial business judgment to bear on a litigation demand," the inquiry concerns the directors who served on the board at the time the demand would have been made.  *See id*.  Therefore, the appropriate inquiry concerns the five current directors on the Bank's board: Ferreira, Parker, Rodriguez, Macias, and Holden.

The Minority Shareholders concede that Holden, the sole "independent" director elected at the recent shareholder meeting, could have impartially considered a litigation demand.  Thus, the Minority Shareholders must sufficiently allege that

at least three of the remaining directors could not impartially consider the demand. They have satisfied this burden in the light most favorable to them at the pleading stage.

### 1. *Louis Ferreira is not disinterested.*

The Minority Shareholders allege two causes of action against Ferreira: a breach of his fiduciary duty of loyalty and a breach of his fiduciary duty of care. And to reiterate, the core allegation made by the Minority Shareholders is that Ferreira accepted equity in the Bank as compensation for allowing the Venezuelan government to exert absolute control over the Bank's operations, which resulted in material non-compliance with the 2020 Consent Order and an array of other alleged harms to the Bank. Based on the allegations in the complaint, we can assume that Ferreira received "a material personal benefit from the alleged misconduct" that would have been the subject of the litigation demand. Put differently, because of the alleged *quid pro quo* between Gabina and Ferreira, the allegations in the complaint plausibly establish a reason to doubt that Louis could have exercised his impartial business judgment with respect to any litigation demand made by the Minority Shareholders that was connected to the alleged *quid pro quo*.

### 2. *Keith Parker is not disinterested.*

The Minority Shareholders levy essentially the same allegations against Parker: he accepted equity compensation in exchange for looking the other way, so to speak, as the Venezuelan government used the Bank as its vessel to transfer Venezuelan assets into the United States banking system. Indeed, the allegations

against Parker appear to be stronger than against Ferreira when considering Parker's longevity on the Bank's board because, unlike Ferreira, Parker led the company while it engaged in the "unsafe" and "unsound" banking practices that warranted the 2018 Consent Order. Moreover, Parker's stewardship resulted in a finding of non-compliance with the 2018 Consent Order, further non-compliance with the 2020 Consent Order, and the array of other alleged harms to the Bank. Accordingly, the Court can infer that Parker received "a material personal benefit from the alleged misconduct" and therefore it is reasonable to doubt that Parker could have exercised his impartial business judgment with respect to any litigation demand made by the Minority Shareholders that was connected to the alleged *quid pro quo*.

### 3.   <u>Carlos Rodriguez is not disinterested.</u>

The finding is no different with respect to Rodriguez. It is sufficiently alleged that he too accepted equity compensation in exchange for allowing the Venezuelan government to control the Bank. Thus, the Court can infer that Rodriguez received "a material personal benefit from the alleged misconduct" and therefore it is reasonable to doubt that Rodriguez could have exercised his impartial business judgment with respect to any litigation demand made by the Minority Shareholders that was connected to the alleged *quid pro quo*.

### 4.   <u>Gustavo Macias is not disinterested.</u>

Having concluded that there is a reasonable doubt that most of the Bank's directors could have exercised their impartial business judgment with respect to any litigation demand made by the Minority Shareholders that was connected to the

alleged *quid pro quo*, the Court need not further assess Macias' impartiality.  But we could nonetheless do so because Macias was similarly involved in the alleged *quid pro quo* scheme that forms the foundation of the Minority Shareholders' complaint.

Accordingly, because four of the Bank's five directors received "a material personal benefit from the alleged misconduct," the demand must be excused as futile at this pleading stage.  *See Zuckerberg*, 262 A.3d at 1059, 1061 ("If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile.")  ("while 'the plaintiff is bound to plead particularized facts in ... a derivative complaint, so too is the court bound to draw all inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought.' "); *see, e.g., Ryan v. Gifford*, 918 A.2d 341, 356 (Del. Ch. 2007) (denying motion to dismiss on futility grounds; "Plaintiff alleges that three members of a board *approved* backdated options, and another board member accepted them. These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering demand."); *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008) (denying motion to dismiss on futility grounds; "because plaintiff has pleaded a duty of care violation with particularity sufficient to create a reasonable doubt that the transaction at issue was the product of a valid exercise of business judgment, demand is excused as futile."); *In re AGNC Inv. Corp.*, 2019 WL 464134, at *9 (D. Md. Feb. 6, 2019) (denying motion to dismiss on futility grounds, applying Delaware law; "Plaintiffs' allegations that the AGNC Board allowed Kain, a conflicted

director, to dominate the consideration of the Internalization and thus failed to consider alternatives are sufficient to create reasonable doubt that the board's approval of the Internalization was the product of an adequately-informed, valid exercise of business judgment.").

### B. *The complaint sufficiently alleges breaches of fiduciary duties.*

Under Florida law, a cause of action for breach of fiduciary duty has three elements: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages flowing from the breach. *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316, 1331 (S.D. Fla. 2018); *Columbia Bank v. Turbeville*, 143 So. 3d 964, 969-70 (Fla. 1st DCA 2014). The Minority Shareholders have alleged sufficient facts to satisfy the elements of this tort regardless of whether the fiduciary duty at issue is the duty of care or the duty of loyalty.

Defendants do not dispute that, as directors of the Bank, they owed the Bank (and therefore its shareholders) the fiduciary duty of care and the fiduciary duty of loyalty. *See* Fla. Stat. § 607.0830 (reciting the general standard for directors under Florida law). Rather, Defendants' arguments essentially boil down to a denial of the allegations in the complaint, which is improper on a motion to dismiss (but may be better received on a motion for summary judgment).[5] Thus, the Court finds that the

---

[5]    Defendants also submit that the complaint is an improper "shotgun" pleading, but this argument is meritless because the complaint specifically identifies which Defendant allegedly engaged in which conduct so as to provide fair notice to each Defendant regarding the allegations against him or her.

Minority Shareholders have sufficiently alleged that Defendants owed a fiduciary duty of care and a fiduciary duty of loyalty to the Bank.

With respect to the breach element, the specific factual allegations are aplenty. And again, the core allegation of a *quid pro quo* scheme, which is itself a breach allegation, pushes the other breach allegations into the realm of plausibility. For example, the Minority Shareholders allege that Defendants breached their fiduciary duty of care and their fiduciary duty of loyalty by failing to comply with the 2018 Consent Order and this breach allegation is plausible because the Bank's non-compliance can be explained by the board of directors' desire to uphold their end of the bargain. Thus, the Court finds that the Minority Shareholders have sufficiently alleged that Defendants breached their fiduciary duties of care and loyalty. *See, e.g., Siegmund v. Xuelian Bian*, 2018 WL 1611847, at *7 (S.D. Fla. Apr. 2, 2018) (Moreno, J.) (denying motion to dismiss; plaintiff pleaded sufficient facts showing directors "breached their fiduciary obligations by utilizing 'their control of the corporation to their own advantage as against the minority stockholders.'") (quoting *Tillis v. United Parts, Inc.*, 395 So. 2d 618, 619 (Fla. 5th DCA 1981)); *Gault v. SRI Surgical Exp., Inc.*, 2012 WL 5199581, at *4 (M.D. Fla. Oct. 22, 2012) ("the allegation that '[t]he [Defendant–Directors] have knowingly or recklessly and in bad faith violated their fiduciary duties by approving the Proposed Acquisition without regard to the fairness of the transaction to SRI shareholders and by failing to disclose all material information' sufficiently supports the occurrence of a breach and enables the claim to survive a motion to dismiss."); *Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 380

(S.D. Fla. 1999) (denying motion to dismiss breach of fiduciary duty claim where "directors/insiders breached their fiduciary duties by engaging in self-dealing transactions, exercising their powers in their own self interest and discharging their duties in a grossly negligent, fraudulent, willful and criminal manner").

Finally, with respect to the damages element, it should be noted up front that the full scale of harm caused by Defendants' breaches presumably cannot be alleged because the harm is allegedly ongoing.[6]  Putting that aside, however, the Minority Shareholders allege that Defendants' breaches have resulted in multi-million-dollar losses and a corresponding decrease in shareholder value, which the Court finds to be a plausible damage allegation. *See, e.g., Gault,* 2012 WL 5199581, at *4.  Moreover, returning to the example of the Bank's non-compliance with the 2018 Consent Order, said non-compliance obviously caused tangible harm to the Bank because it subsequently had to incur expenses, legal and otherwise, relating to the negotiation and issuance of the 2020 Consent Order.  Thus, the Court finds that the Minority Shareholders have sufficiently alleged that the Bank has incurred damages as a result of Defendants' breaches of their fiduciary duties.  The full extent of those monetary damages need not be specially pled in the complaint but will be discoverable in the litigation.

Additionally, the complaint alleges that the Bank has suffered and will suffer tangible injury from the alleged fiduciary breaches at issue.  That injury may be

---

[6]     The Minority Shareholders have moved for a preliminary injunction, which is currently pending before the Court. [D.E. 6].

redressable through equitable remedies in lieu of monetary damages.  That allegation also is sufficient to plead the cause of action at this stage.  Therefore, the Minority Shareholders have sufficiently alleged both causes of action in their complaint.

### C.   *The business judgment rule would not apply on these facts.*

Defendants' final argument in favor of its motion to dismiss is that, assuming the allegations to be true, their conduct is protected to the business judgment rule. *See* Fla. Stat. § 607.0830; *see generally Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 574 (11th Cir. 1988) ("Under the business judgment rule directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in fraud, bad faith or an abuse of discretion.").

As an initial matter, the propriety of evaluating the applicability of the business judgment rule at the motion to dismiss phase is debatable.  *Compare F.D.I.C. v. Gonzalez-Gorrondona*, 833 F. Supp. 1545, 1561 (S.D. Fla. 1993) (finding that the complaint alleged facts that fell "beyond the ambit of the protections" of the business judgment rule), *with F.D.I.C. v. Stahl*, 840 F. Supp. 124, 128-29 (S.D. Fla. 1993) (declining to apply the business judgment rule in the motion to dismiss context).  Nevertheless, *Stahl* acknowledged that the business judgment rule does not apply when the business decision at issue is tainted by a conflict of interest.  *See Stahl*, 840 F. Supp. at 128 (citing *Joy v. North*, 692 F.2d 880 (2d Cir. 1982)).

Here, the same reasons that justify the Court's demand-futility finding justify the rejection of Defendants' business judgment rule argument at this stage of the litigation.  Specifically, if the Court were to accept the Minority Shareholders

allegations as true, as it must do on a motion to dismiss, then it must find that the alleged conduct falls "beyond the ambit of the protections" of the business judgment rule. *See Gonzalez-Gorrondona*, 833 F. Supp. at 1561. The core allegation in the complaint is that the Bank's board of directors accepted equity compensation in exchange for allowing the Venezuelan government to exercise absolute control over the Bank, which in turn enabled the Venezuelan government to evade sanctions imposed by the President of the United States of America. Such evasion jeopardizes the security of our nation, prolongs the corruption in the Venezuelan government, empowers the continued violation of basic human rights in Venezuela, and harms the interests of the Bank's shareholders. The business judgment rule does not protect this conduct; so, the complaint should not be dismissed on that basis, allowing instead for factual development that may shed further light on this question. *See also Gault,* 2012 WL 5199581, at *4 (denying motion to dismiss on business judgment rule grounds; "regardless of whether the business judgment rule may ultimately operate to shield Defendant–Directors from liability for their actions regarding the transaction, the Court finds that such a determination would be inappropriate at this juncture"); *Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.,* 2008 WL 926509, at *5 (S.D.Fla. Mar. 31, 2008) ("[T]he Court considers it unwise to evaluate conduct and determine whether or not it is protected by the business judgment rule at the motion to dismiss stage.") ("Here, the Receiver makes numerous allegations that the applicable fee structure created an incentive for the Director

Defendants to artificially inflate the NAV's for their personal gain and to the detriment of the Offshore Funds.").

## IV.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendants' motion to dismiss be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 14th day of June, 2022.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge