## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20201-CV-GAYLES/TORRES

BANCOR GROUP INC., and
STITCHING PARTICULIER FONDS
FRANEKER, derivatively on behalf of
EASTERN NATIONAL BANK, N.A.,

     *Plaintiffs,*

v.

GABINA RODRIGUEZ,
LOUIS FERREIRA,
CESAR GOMEZ VALERO,
KEITH PARKER,
CARLOS RODRIGUEZ, and
GUSTAVO MACIAS,

     *Defendants.*

_____/

### REPORT AND RECOMMENDATION ON PLAINTIFFS'
### AMENDED MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on Plaintiffs' Amended Motion for Preliminary Injunction. [D.E. 115].[1] The motion is fully briefed and therefore ripe for disposition. Having conducted a three-day evidentiary hearing and reviewed the briefing, the record, and the relevant authorities, the Court recommends that Plaintiffs' motion be **DENIED** for the reasons discussed below.

---

[1]     On January 21, 2022, the Honorable Darrin P. Gayles referred all pretrial matters to the undersigned Magistrate Judge for disposition. [D.E. 9].

# I.    BACKGROUND

Plaintiffs, suing derivatively on behalf of Eastern National Bank, N.A., have filed a two-count complaint against Defendants in their individual capacity. Defendants are now, or were previously, directors appointed to the Bank's board. Plaintiffs allege that Defendants have breached the fiduciary duties that they owe the Bank, which caused harm to the Bank, and have therefore violated Florida law.

More specifically, Plaintiffs allege that Defendants have breached their fiduciary duty of care in multiple ways: (1) by failing to comply with the express terms of two successive Consent Orders imposed by the Bank's regulator, (2) by failing to hold an annual shareholders meeting in 2018, 2019, and 2020; (3) by failing to submit an independent auditors' report to the Bank's shareholders in 2018, 2019, and 2020; (4) by failing to hold a shareholder vote regarding the implementation and expansion of an equity incentive plan and instead giving Defendant Gabina Rodriguez sole authority over the plan; (5) by failing to obtain prior approval regarding the implementation and expansion of that equity incentive plan from the relevant authorities within the United States Department of the Treasury; (7) by approving that equity incentive plan, which was the result of self-dealing and provided no value to the Bank's shareholders; (8) by allowing the Bank to be managed and controlled at the direction of the Venezuelan government; (9) by making misrepresentations to the United States Department of the Treasury; (10) by improperly allowing the Bank's majority shareholder to vote during the 2021 shareholders meeting; (11) by appointing invalid election judges at the 2021 shareholders meeting; (12) by

proposing a modification to the Bank's articles of association that authorized one million additional shares of stock in the Bank; (13) by rejecting particular capitalization opportunities; and (14) by improperly facilitating Defendant Gabina Rodriguez's involvement after her removal from the Bank's board of directors.[2]

Plaintiffs additionally allege that Defendants have breached their fiduciary duty of loyalty in several ways: (1) by failing to comply with the express terms of two successive Consent Orders imposed by the Bank's regulator; (2) by failing to hold a shareholder vote regarding the implementation and expansion of an equity incentive plan and instead giving Defendant Gabina Rodriguez sole authority over the plan; (3) by failing to obtain prior approval regarding the implementation and expansion of that equity incentive plan from the relevant authorities within the United States Department of the Treasury; (4) by approving that equity incentive plan, which was the result of self-dealing and provided no value to the Bank's shareholders; (5) by allowing the Bank to be managed and controlled at the direction of the Venezuelan government; and (6) by intentionally violating their obligations to the relevant authorities at the United States Department of the Treasury.[3]

As a result of the foregoing breaches, Plaintiffs allege that the Bank has been and will continue to be harmed. Accordingly, Plaintiffs seek to enjoin the Bank's

---

[2]    Not all of these theories of liability are alleged against Defendants Louis Ferreira and Gabina Rodriguez because they were not on the Bank's board of directors at the time of the alleged breach. *See* [D.E. 59 at ¶¶ 107-09].

[3]    Not all of these theories of liability are alleged against Defendants Louis Ferreira and Gabina Rodriguez because they were not on the Bank's board of directors at the time of the alleged breach. *See* [D.E. 59 at ¶¶ 115-17].

board of directors from (1) implementing or further effectuating the equity incentive plan and (2) issuing any of the one million additional shares authorized at the December 2021 shareholder meeting.

## II.   STANDARD OF REVIEW

To obtain a preliminary injunction, the movant must clearly establish (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018).   A preliminary injunction is "an extraordinary and drastic remedy" that cannot be issued unless the movant clearly establishes all four of the foregoing elements. *Keister*, 879 F.3d at 1287-88 (quoting *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)).

The goal of a preliminary injunction is to "protect the plaintiff from irreparable injury and preserve the district court's power to render a meaningful decision after a trial on the merits." *Telestrata, LLC v. NetTALK.com, Inc.*, 126 F. Supp. 2d 1344, 1350 (S.D. Fla. 2015) (quoting *Long v. Benson*, 383 F. App'x 930, 931 (11th Cir. 2010)). Given this limited purpose, a party is not required to prove its case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made at this stage are not binding at a trial on the merits.   *Id.* (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).   The evidentiary rules are therefore relaxed, and so a court may rely on affidavits and hearsay materials that would not be

admissible evidence for a permanent injunction "so long as the evidence is appropriate given the character and purpose of the injunction proceedings." *Armour Group, Inc. v. Labock*, No. 11-61991, 2012 WL 12837289, at *1 (S.D Fla. Mar. 26, 2012) (citing *Levi Strass & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)).

### III.    FINDINGS OF FACT

#### A.    *The Bank and its ownership structure.*

Eastern National Bank, N.A., is a federally chartered bank that is headquartered in Miami-Dade County, Florida.  Plaintiffs Bancor Group Inc. and Stitching Particulier Fonds Franeker are two of the Bank's minority shareholders. Defendants Gabina Rodriguez and Cesar Gomez Valero previously served on the Bank's board of directors.  Defendants Louis Ferreira, Keith Parker, Carlos Rodriguez, and Gustavo Macias currently serve on the Bank's board of directors.

Until December 2021, the Bank's articles of association authorized two million shares of common stock at a par value of $16.00 per share.  None of these shares carry preemptive rights.  The Bank has issued 925,189 of these shares to its shareholders and held the remaining 1,074,811 shares in reserve.  *See* Exhibit 1 (illustrating the Bank's ratio of issued shares to authorized-but-unissued shares prior to December 2021).



Exhibit 1

- Majority Shareholder (Mercorp)
- Minority Shareholders
- Reserve Shares

Bancor owns 63 of the issued shares and Franeker owns 22, collectively representing less than 0.01% of all issued shares.   Mercorp, N.V., a company organized under the laws of Curaçao, owns 923,932 – roughly 99.8% – of all issued shares, which makes Mercorp the Bank's largest shareholder and effectively gives it control over the Bank's board of directors.

Mercorp is a wholly owned subsidiary of Corpofin, C.A., a company organized under the laws of Venezuela.  Since 1994, the Venezuelan government has subjected Corpofin to its version of a receivership due to Corpofin's failure to satisfy a debt owed to the Venezuelan government.  In 2009, Gabina Rodriguez, a Venezuelan lawyer, was appointed by the Venezuelan government to act as the administrative intervenor for Corpofin – a role similar to that of an equitable receiver.

Using the power of her appointment, Gabina Rodriguez installed herself as the managing director of Mercorp.  And by virtue of Mercorp's controlling interest in the Bank, Gabina Rodriguez elected herself to the Bank's board of directors in 2015.  She served on the board of directors until 2021, when she was forced to resign because the Office of the Comptroller of the Currency ("OCC"), a division of the United States Department of the Treasury and a regulator of the Bank, revoked her residency waiver and thereby rendered her continued service on the board unlawful.

By virtue of her appointment as the administrative intervenor of Corpofin, Gabina Rodriguez has a limited but cognizable obligation to report information to and receive input from the Venezuelan government.  Accordingly, Mercorp and Corpofin, when acting under the direction and control of Gabina Rodriguez, have been

6

perceived by the United States government to be agencies of the Venezuelan government. And because of this structure of corporate ownership, the United States Department of the Treasury has qualified the Bank as an entity under the control of the Venezuelan government.

### B.   *The trouble with the Banco de Venezuela correspondent account.*

In 2017, as the United States government began to enhance its economic sanctions against the Venezuelan government in response to that regime's widely documented human rights abuses, most United States banks ended their correspondent banking relationships with Venezuelan banks because it became increasingly more difficult (and expensive) to operate those accounts in compliance with the laws of the United States. Banco de Venezuela, a bank based in Caracas, was one of the Venezuelan banks that lost its correspondent banking connection to the United States around this time.

In contrast to its competitors, the Bank considered *opening* a correspondent bank account for Banco de Venezuela in 2017. Prior to doing so, the Bank was warned by the OCC that opening the Banco de Venezuela account would prove very risky in light of the sophisticated compliance infrastructure that the Bank would need to implement. Despite this warning, the Bank decided to open a correspondent account for Banco de Venezuela.

When this decision was made, Gabina Rodriguez was not the only board member with strong ties to the Venezuelan government. In addition to his role on the Bank's board of directors, Cesar Gomez Valero also worked as the "Indendent of

7

Private Banking Inspection" at the Superindendence of Banks of the Bolivarian Republic of Venezuela ("Sudeban"), which is to say that he was second-in-command at the Venezuelan government's version of the Federal Deposit Insurance Corporation ("FDIC").

Within a matter of months, the Bank's compliance infrastructure proved insufficient.  Accordingly, in October 2018, the OCC issued a Consent Order against the Bank due to its failure, among other things, to operate the Banco de Venezuela correspondent account in compliance with the Bank's relevant Bank Secrecy Act and Anti-Money Laundering obligations.

The 2018 Consent Order required the Bank to fix these deficiencies.  It further required the Bank to develop a strategic plan for implementing "a succession program to promote the retention and continuity of capable senior management and board members" and for meeting the Bank's "minimal capital requirements."

As a result of the Bank's decision to open the Banco de Venezuela correspondent account, the Bank incurred significant expenses that it would not have otherwise incurred.  Examples of these expenses include legal fees relating to negotiating the 2018 Consent Order and labor costs associated with a detailed "look-back review" of the Banco de Venezuela correspondent account to determine whether any of those transactions violated the laws of the United States.

C.    ***The creation and expansion of the equity incentive plan.***

In response to its OCC-imposed obligation to develop a plan for retaining capable senior management and board members, the Bank's board of directors crafted

8

an equity incentive plan that provided for the issuance of "Restricted Stock Units" or "RSUs" to the plan's beneficiaries.  In simple terms, the equity incentive plan set aside 200,000 of the Bank's authorized-but-unissued shares and, from this pool of earmarked shares, RSUs would be awarded to certain directors, officers, and employees of the Bank as a component of the beneficiary's compensation package.

An RSU award under the equity incentive plan is not an award of shares in the Bank.  By contrast, it is an award of a right to receive shares in the Bank at a future date (i.e., at the time of vesting) if certain conditions are met, such as the requirement that a beneficiary remain in service of the Bank at the time of vesting. Assuming that the RSU award vests, however, one RSU entitles the beneficiary to one share of common stock in the Bank.

The board of directors relied upon the powers granted to it in the Bank's articles of association and bylaws to craft this equity incentive plan.  These governing documents provide the board of directors with, among other things, the power to define the compensation for directors, officers, and employees of the Bank, the power to manage the business affairs of the Bank, and the power to enter into contracts on behalf of the Bank.

To administer the equity incentive plan, a committee comprised of three or more of the Bank's board of directors was established.  Among the first to receive an RSU award under the equity incentive plan were the directors on the board at the time the plan was crafted.  Accordingly, Defendants Gabina Rodriguez, Cesar Gomez

Valero, Gustavo Macias, Keith Parker, and Carlos Rodriguez each received 36,000 RSUs as compensation for their service on the board.

The equity incentive plan was subsequently expanded to earmark 300,000 of the Bank's authorized-but-unissued shares, and RSU awards were made to beneficiaries beyond the Bank's board of directors – e.g., officers and employees of the Bank, consultants, and lenders. Defendant Louis Ferreira is also a beneficiary under the plan, having been awarded 36,000 RSUs since he joined the Bank.

Although it is not uncommon to incentivize those who serve a company with an RSU award, the equity incentive plan crafted in response to the 2018 Consent Order does have a few curious features. First, the committee responsible for administering the plan has the power to determine when an RSU award vests. Second, however, vesting may be accelerated upon a change of control, which essentially means that RSU awards vest immediately if 25% or more of the Bank's common stock changes hands. And third, a change of control also grants the committee the power to cancel an outstanding RSU award and pay the beneficiary the aggregate cash value of the stock instead of the stock itself.

The creation of this equity incentive plan also has implications for the Bank's OCC-imposed obligation to recapitalize itself. Because it earmarked about one third of its authorized-but-unissued shares for its equity incentive plan, the Bank effectively limited the pool of potential investors to those suitors who do not desire a controlling interest in the Bank. In other words, because the Bank held more than 50% of its authorized shares in reserve before the creation of the equity incentive

plan, a potential investor could have paid the Bank roughly $17,100,000.00 to become the Bank's majority shareholder and thereby effectively control the Bank. *See* Exhibit 2 (illustrating the Bank's ownership structure prior to December 2021 and taking account of the shares earmarked for the equity incentive plan). Such an investment would have sufficiently recapitalized the Bank and therefore brought the



Bank into compliance with the capitalization requirement of the 2018 Consent Order. But because the equity incentive plan carved out a significant chunk of the Bank's authorized-but-unissued shares, the Bank's pitch to potential investors became far less attractive in light of the Bank's inability to issue enough shares to grant any investor control of the Bank.

> **D.**     *Two Consent Orders, zero shareholder meetings.*

In 2020, the OCC subjected the Bank to another Consent Order and therein found that the Bank failed to attain compliance with the 2018 Consent Order. Indeed, the OCC found that things at the Bank had, in many ways, gotten worse instead of better.

The Bank's annual shareholder meeting is a routine event that is required by the Bank's articles of association and its bylaws. It is the event, for example, where the Bank's board of directors is elected. But since the first Consent Order was handed

down in October 2018, the Bank's board of directors neglected to hold an annual shareholder meeting for over three years.

Although the Bank held an annual shareholder meeting in the spring of 2018, months before the first Consent Order was finalized, the Bank thereafter failed to hold an annual shareholder meeting in 2019 and 2020. Indeed, for reasons not disclosed by either party, it is evident that no shareholder meeting took place until thirteen months after the Bank was subjected to its *second* Consent Order.

### E.    *The December 2021 shareholder meeting.*

Since it enacted the equity incentive plan, the Bank had been unsuccessful in its attempts to sufficiently recapitalize itself. Ultimately, therefore, it became apparent that the Bank needed to offer controlling interest in the Bank if it wanted to attract a competent investor. To do that, however, the Bank would need to modify its articles of association and thereby authorize additional shares of common stock. Such a modification required a shareholder vote. And so, on December 17, 2021, the Bank's board of directors finally held an annual shareholder meeting.

Plaintiffs attended this shareholder meeting and voiced their objections to the Bank's leadership in no uncertain terms. Among other things, Plaintiffs complained that allowing Gabina Rodriguez to vote Mercorp's shares at the meeting violated the Bank's relevant OFAC license and, moreover, would be unlawful given Mercorp's then-lapsed registration with the Curaçao authorities.[4]

---

[4]    OFAC confirmed in writing before the December 2021 shareholder meeting that voting Mercorp's shares would *not* violate the relevant OFAC license. And, sometime after the meeting, Mercorp fixed its registration issue in Curaçao.

Despite these protests, which ultimately resulted in Plaintiffs leaving the meeting before any votes were cast, the elections proceeded, and Louis Ferreira, Keith Parker, Carlos Rodriguez, Gustavo Macias, and Edward Holden were elected to the Bank's board of directors. The shareholders also voted on a measure to increase the number of authorized shares of common stock in the Bank from two



million to three million. With the support of Mercorp, the measure overwhelming passed, and the Bank's articles of association were modified to authorize three million shares of common stock with a par value of $16.00 per share and no preemptive rights. *See* Exhibit 3 (illustrating the Bank's ownership structure after December 2021 and accounting for the equity incentive plan).

Because the Bank is still searching for an investor to recapitalize the Bank, Exhibit 3 reflects the current division of ownership in the Bank. It enables the Bank to maintain its equity incentive plan *and* recapitalize itself by issuing more than 50% of its authorized shares to a potential investor. Although the Bank has received investment offers, it has not accepted any offers yet and has instead rejected multiple offers from different potential investors, including one offer from an investment group that included Plaintiff Bancor. Before the Bank can accept a recapitalization offer, however, it must obtain approval of the transaction from its regulators. For this and

other reasons, it is clear that the Bank is still not in compliance with the 2020 Consent Order.

And so, to reiterate, Plaintiffs seek to enjoin Defendants from (1) implementing or further effectuating the equity incentive plan and (2) issuing any of the one million additional shares authorized at the December 2021 shareholder meeting. For the reasons discussed below, this Court finds that, though there may ultimately be merit in some of their claims, Plaintiffs have failed to meet their burden and are therefore not entitled to the preliminary relief they seek.

## IV.   ANALYSIS

Because it is Plaintiffs' obligation to clearly establish a substantial likelihood of success on the merits, the Court must first identify the elements of the claims alleged. *See Armour Group,* 2012 WL 12837289 at *2 (discussing the elements of trademark infringement in the preliminary injunction context). Here, Plaintiffs allege only that Defendants have breached both their fiduciary duty of care and their fiduciary duty of loyalty.

Under Florida law, a cause of action for breach of a fiduciary duty has three elements: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages flowing from that breach. *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316, 1331 (S.D. Fla. 2018); *Columbia Bank v. Turbeville*, 143 So. 3d 964, 969-70 (Fla. 1st DCA 2014).

It is indisputable that, by virtue of their role on the Bank's board of directors, Defendants owed a fiduciary duty of care and a fiduciary duty of loyalty to the Bank

14

at the time of their alleged breaches.  *See* Fla. Stat. § 607.0830 (reciting the general standards for directors under Florida law).  But recognition of that legal conclusion does not mean that Plaintiffs need only clearly establish the elements of breach and damage to demonstrate a substantial likelihood of success on the merits because, under Florida law, Defendants actions are presumptively protected by the business judgment rule.

The business judgment rule generally provides that a director of a company is not personally liable for the actions taken as a director unless (1) the director failed to perform his or her duties as a director or (2) the director acted fraudulently, illegally, oppressively, or in bad faith.  *See* Fla. Stat. § 607.0831(1); *F.D.I.C. v. Stahl*, 89 F.3d 1510, 1518 (11th Cir. 1996) (interpreting Florida law); *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 574 (11th Cir. 1988) ("Under the business judgment rule directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in fraud, bad faith or an abuse of discretion.").  Accordingly, the business judgment rule creates a "limited presumption of correctness" for a director's decisions.  *Aerospace Accessory Service, Inc. v. Abiseid*, 943 So. 2d 866, 867 (Fla. 3d DCA 2006).

This is not a presumption in the procedural sense; rather, the business judgment rule is substantive and reflects "a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges." *Royal Harbour Yacht Club Marina Condo. Ass'n, Inc. v. Maresma*, 304 So. 3d 1268, 1269 (Fla. 3d DCA 2020); *In re Bal Harbour Club, Inc.*,

316 F.3d 1192, 1195 (11th Cir. 2003) ("In using the word 'presumption' or 'presumed' in articulating the business judgment rule, the courts have not intended to create a presumption in the classical procedural sense—as a vehicle that puts the burden of going forward with the evidence on the party without the burden of proof.").

Therefore, to summarize Plaintiffs' remaining burden in their pursuit of a preliminary injunction, they must clearly establish the following: (1) a substantial likelihood of success on merits – i.e., adequately showing that Defendants breached their fiduciary duty, that the action constituting the breach is not protected by the business judgment rule, and that the breach damaged the Bank; (2) a substantial threat of irreparable injury if the preliminary injunction does not issue; (3) that the balance of equities tips in their favor, which is to say that the threatened injury to Plaintiffs outweighs the harm that may flow from enjoining Defendants; and (4) that the preliminary injunction will serve the public interest.  It is well-established, however, that if Plaintiffs fail to clearly establish a substantial likelihood of success on the merits, the Court need not consider the other factors. *Keister*, 879 F.3d at 1288 (citing *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011)).

The problem for Plaintiffs is that they have failed to clearly establish a substantial likelihood of success regarding their ability to overcome the business judgment rule.  Nothing in the record presented to this Court clearly establishes that Defendants' alleged breaches of their fiduciary duties constitute unquestionable bad faith or a species of similar misconduct that permits the Court to second guess the judgment of the Bank's board of directors.  That, at the very least, requires a full

16

examination of the record and potentially credibility findings that are properly left to the trier of fact. And based on the record presented at the hearing and the supporting documents, the Court cannot categorically find that there is a substantial likelihood that those credibility findings will inure to Plaintiffs' benefit. These types of cases that seek to overcome the business judgment rule are difficult to prove. That is the point of the rule in the first place. So given the burden that Plaintiffs face, and though we may agree that there may be merit to some of their claims, the record is not demonstrable enough to enter any preliminary injunctive relief.

Consider, for example, Plaintiffs' theory that Defendants have breached their fiduciary duties by allowing the Bank to be controlled by the Venezuelan government. Although the record clearly establishes that Defendants' decision to open the Banco de Venezuela correspondent account was motivated in part by a desire to enable a Venezuelan banking institution to maintain its presence in the United States, nothing in the record sufficiently evidences that this decision was made pursuant to an order from the Venezuelan government. Indeed, the record reflects that the OCC-mandated "look-back review" of the transactions associated with that correspondent account did not uncover anything that ran afoul of the laws of the United States, including the recent economic sanctions against the Venezuelan government. So, even though the record suggests that this correspondent account was opened to appease the Venezuelan government and enable its access to the United States banking system, the record presented to this Court also evidences Defendants' attempt to capitalize on an opportunity and their subsequent failure to properly

17

execute their chosen business strategy.  At most, therefore, the record indicates that helping Banco de Venezuela was a positive externality that the Bank was cognizant of when it opened that correspondent account.   On such a record, we cannot circumvent the business judgment rule at this stage of the case.

Alternatively, consider the equity incentive plan that Plaintiffs seek to enjoin from implementation.  Not only did the Bank's articles of association and bylaws authorize the board of directors to create and implement this plan, but Defendants were instructed by the OCC to establish a compensation scheme that would attract and retain talent at the Bank.  The mere fact that the plan created in response to this mandate from the OCC compensates the directors as well as other officers and employees at the Bank is not enough to clearly establish that the plan was crafted in bad faith.

Plaintiffs allege that the creation and implementation of this equity incentive plan required shareholder approval, but the evidence submitted to the Court shows just the opposite.  The Bank's shareholders do not have preemptive rights.  Without preemptive rights, the shareholders' input is not required when the Bank seeks to issue previously authorized shares or otherwise earmark those shares pursuant to an equity incentive plan.  *See* Fla. Stat. § 607.0630 (discussing preemptive rights under Florida law).  We cannot say that Defendants' decision to create and implement this plan was made in bad faith (or would otherwise justify our circumvention of the business judgment rule) simply because Defendants did not do something they were

not required to do – i.e., present the plan to the shareholders for shareholder approval.

And with regard to Mercorp's vote to authorize additional shares at the December 2021 shareholder meeting, Plaintiffs have failed to clearly establish how Defendants' choice to allow Mercorp to vote at the shareholder meeting permits us to bypass, based on a slim preliminary showing, the business judgment rule simply because Mercorp's registration with the relevant Curaçao authorities had lapsed at the time of the meeting.

Under Florida law, a company that fails to register with the proper authorities is involuntarily dissolved and therefore unable to carry on any business. *Allied Roofing Indus., Inc. v. Venegas*, 862 So. 2d 6, 9 (Fla. 3d DCA 2003). Plaintiffs argue that the same is true under Curaçao law, [D.E. 115 at 12], but they fail to actually provide the Court with proof of this, [D.E. 108-1]. When the registration issue is cured in Florida, however, the company is reinstated *nunc pro tunc*, which is to say that the reinstatement treats the failure to register as though it never happened. Fla. Stat. § 607.1422; *Allied Roofing*, 862 So. 2d at 8.

Plaintiffs do not argue or submit evidence that indicates the law of Curaçao to be any different with respect to the relation-back nature of reinstatement under Florida law and, in the absence of any evidence regarding the relevant Curaçao law, we are entitled to presume the foreign law to be the same as Florida law. *See The Maggie Hammond*, 76 U.S. 435, 441 (1869) ("[I]n the absence of proof—of which there is none here—the foreign law and our own must be presumed to be the same.");

*Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1136 (11th Cir. 2020) ("Furthermore, under Florida law, absent proof that foreign law differs from that of the forum state, the court is entitled to presume it is the same.") (internal quotations omitted and alterations adopted).

Because Mercorp subsequently fixed its registration issue with the Curaçao authorities, we have no reason to conclude that its actions at the December 2021 shareholder meeting were not arguably retroactively validated (or that Defendants had reason to believe that Mercorp's actions at the shareholder meeting could not be retroactively validated, rendering its votes improper). Accordingly, we have no reason to bypass the business judgment rule based on the existing record.

To put it succinctly, none of the theories of liability alleged by Plaintiffs that could theoretically entitle them to the remedy of their requested injunctions have been clearly established by this record. Accordingly, they have failed to demonstrate a substantial likelihood of success on the merits. Therefore, no preliminary injunction should issue, and the claims should proceed to their ultimate conclusion after a complete record is presented to the Court and/or, if necessary, a trial is convened. We cannot say with reasonable certainty that Plaintiffs will prevail on their claims, so we are precluded from entering any preliminary relief on this complaint.

## V. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Plaintiffs' amended motion for a preliminary injunction be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from de novo determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 21st day of December, 2022.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge