## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 22-20201-CV-GAYLES/TORRES

BANCOR GROUP INC., and
STITCHING PARTICULIER FONDS
FRANEKER, derivatively on behalf of
EASTERN NATIONAL BANK, N.A.,

      *Plaintiffs*,

v.

GABINA RODRIGUEZ,
LOUIS FERREIRA,
CESAR GOMEZ VALERO,
KEITH PARKER,
CARLOS RODRIGUEZ, and
GUSTAVO MACIAS,

      *Defendants*.

_____/

## OMNIBUS ORDER

On January 21, 2022, the Honorable Darrin P. Gayles referred all pretrial matters to the undersigned for disposition. [D.E. 9]. This Order therefore resolves thirteen of the parties' pending motions in this case, which concern requests to extend the discovery deadline, to adjudicate a privilege dispute, to exclude evidence from the record, and to disqualify Plaintiffs' counsel. [D.E. 219, 250, 257, 258, 267, 278, 279, 281, 282, 283, 319, 320, and 321].

# I.   BACKGROUND

This is a shareholder derivative action in which two minority shareholders have sued current and former directors of Eastern National Bank, N.A. (the "Bank") for breaches of their fiduciary duties of care and loyalty.  The parties have engaged in a substantial amount of pretrial motion practice.  The non-dispositive motions are resolved in this Order.  Dispositive motions remain pending.

# II.   ANALYSIS

Plaintiffs seek to extend the discovery window in the case for the limited purpose of conducting one deposition.  [D.E. 219].  Plaintiffs also ask the Court to adjudicate a privilege dispute involving the United States Department of the Treasury's Office of the Comptroller of the Currency (the "OCC").  [D.E. 250].  In relation to this privilege dispute, Defendants move to strike the documents at issue from the record and disqualify Plaintiffs' counsel from this case for attempting to rely on those documents to make their case.  [D.E. 319, 320, 321].  The parties have also filed various *Daubert* motions and motions *in limine*.  [D.E. 257, 258, 267, 278, 279, 281, 282, and 283].  Each motion will be discussed in turn.

## A.   *The motion to extend the discovery cutoff.*

The fact discovery window in this case was scheduled to close on March 11, 2023.  Accordingly, Plaintiffs sought to depose non-party Rolando Parets, the Bank's Chief Financial Officer, before the fact discovery cutoff.  To accomplish this objective, Plaintiffs served Mr. Parets with a subpoena duces tecum that specified the date of his deposition as March 6, 2023.  Plaintiffs additionally noticed the deposition of Mr.

Parets, but that notice stated that his deposition was scheduled to occur on March 9, 2023 – three days after the date identified in the subpoena.

In compliance with the subpoena, Mr. Parets arrived at the office of Plaintiffs' counsel on March 6 to sit for his deposition. Unaware (until that point) that the dates listed in the subpoena and the notice were not the same, Plaintiffs' counsel was surprised by Mr. Parets' arrival and ultimately sent him home without asking him any questions under oath because they were not available to depose him at that time. Because Mr. Parets was not available for a deposition on March 9 (or on March 10, or on March 11), Plaintiffs moved to extend the discovery cutoff so that Mr. Parets could be deposed after March 11, 2023.

Federal Rule of Civil Procedure 16(b)(4) provides that a scheduling order may be modified only with "good cause" and the "consent" of the Court. Plaintiffs took a risk by scheduling Mr. Parets' deposition within the last week of discovery. This risk was compounded by their inattention to detail. Thus, their inability to reschedule the deposition of Mr. Parets before the discovery cutoff is a problem of their own making. That circumstance does not present good cause for purposes of Rule 16 to extend the discovery cutoff in this case that has already been heavily litigated. And so, because the failure to adequately proofread a subpoena is not "good cause" to modify the scheduling order, this motion, [D.E. 219], is DENIED.

### B.   *The motion to adjudicate a privilege dispute with the OCC.*

During discovery, Plaintiffs received 31 documents from Defendants. Subsequently realizing that these documents constituted "non-public OCC

information" as defined by 12 C.F.R. § 4.32, Defendants sought to claw back these documents pursuant to the protective order issued in this case.  In due course, the OCC was notified of Defendants' inadvertent disclosure and, as the party presumptively holding the privilege over these documents, the OCC intervened in this case to assert and defend its privilege over these documents.[1]

The documents at issue are comprised of the OCC's Reports of Examination, correspondence to and from the OCC, internal Bank correspondence about the OCC, and other materials prepared for or shared with the OCC during its regulatory activities.  The relevance of these documents to this case varies; however, the most obvious connection to Plaintiffs' claims is that the documents appear to evidence the OCC's dissatisfaction with and criticism of the Bank's leadership during the relevant time period.

For example, in its Report of Examination dated March 27, 2018, the OCC made a factual finding that the Bank had "significant and ongoing BSA compliance deficiencies and credit administration issues that have negatively impacted the Bank's financial position and risk profile."  [D.E. 250-1 at 2].[2]  Furthermore, by

---

[1]    In addition to its assertion of privilege, the OCC argues that it should not be compelled to produce the documents at issue because Plaintiffs failed to request these documents from the OCC according to the OCC's regulations, 12 C.F.R. § 4.33.  This argument misses the mark because Plaintiffs are not moving to compel these documents from anyone – the documents are already in Plaintiffs' possession.  Thus, the only issue before the Court is whether the documents are privileged and, if so, what Plaintiffs may do with these documents.

[2]    Due to the sensitive and voluminous nature of this privilege dispute, Plaintiffs delivered the 31 exhibits to their motion to the undersigned's chambers in a hard copy format for an *in camera* review.  For the sake of clarity, we cite these exhibits as

engaging in a foreign correspondent banking relationship with Banco de Venezuela, the OCC found that the Bank permitted a "lack of management oversight over the BSA/AML area" that resulted in the Bank's failure to timely detect and report suspicious activity. *Id*. Accordingly, the "lookback" performed on the Banco de Venezuela correspondent account prompted the Bank to file a "late" Suspicious Activity Report ("SAR"), which resulted in the Bank's violation of 12 C.F.R. § 21.11. *Id*. Moreover, the OCC found that the "timing" of the Bank's termination of its former BSA Officer, Jack Lantz, "contributed to the lack of oversight" regarding the Banco de Venezuela correspondent account. *Id*. As a result of these factual findings, it was the OCC's opinion that the Bank's board of directors and management were "deficient." *Id*.

In its Report of Examination dated March 4, 2019, the OCC modified its opinion of the Bank's leadership and found that the Bank's board of directors and management were "*critically* deficient."   [D.E. 250-2 at 2 (emphasis added)]. Underpinning this opinion was, in part, the OCC's factual findings that the Bank's then-chairperson, Defendant Gabina Rodriguez, lacked experience leading a community bank under an enforcement action, that the Bank's board of directors was "passive," that the management team was "unproven," that the Bank suffered from significant turnover in the BSA department, that the Bank's leadership was

---

attachments to Docket Entry 250 as though the exhibits were filed on the Court's CM/ECF system.  "BSA" and "AML" are abbreviations of the "Bank Secrecy Act" and "Anti-Money Laundering" laws respectively, which are referred to extensively in the communications prepared by or for the OCC.

"ineffective," and that numerous "unsafe and unsound" banking practices had been recently uncovered by the OCC. *Id.*

In its Report of Examination dated December 13, 2019, the OCC did not change its opinion; the Bank's board of directors and management remained "critically deficient" in the eyes of their regulator. [D.E. 250-3 at 2]. This was because, among other things, "[e]nterprise governance was severely lacking." *Id.* For example, said the OCC, in May 2019 – only two months after the OCC admonished Defendant Gabina Rodriguez for her ineffective leadership – the Bank's board of directors unanimously approved a "substantial increase" to her salary "without conducting and documenting due diligence to support the decision." *Id.*

Additionally, on June 5, 2020, for example, the OCC found that Defendant Gabina Rodriguez "pressured" Bank staff to open a foreign correspondent banking relationship with Banco de Venezuela despite the "significant risks and objections" expressed by the Bank's BSA Officer, Jack Lantz, which she did not convey to the Bank's board of directors. [D.E. 250-6 at 2]. According to the OCC, Defendant Gabina Rodriguez was "bias[ed]" toward the Venezuelan government and its instrumentalities, including Banco de Venezuela, in a way that was "contrary to the interests of the Bank." *Id.* Accordingly, the OCC proposed to revoke Defendant Gabina Rodriguez's citizenship waiver. *Id.* at 1. But we need not describe the contents of these disputed documents in exacting detail before reaching the heart of the issue – whether these documents are privileged and, if so, whether good cause exists to override the privilege asserted by the OCC.

The OCC submits that the documents at issue are protected from disclosure and use by the bank examination privilege.  Much of Plaintiffs' briefing refers to a different privilege – the deliberative process privilege – but the OCC posits that Plaintiffs have erroneously "conflate[d]" the bank examination privilege with the deliberative process privilege.  [D.E. 273 at 11-12].  The OCC is the privilege-holder, and so we accept the OCC's assertion of the bank examination privilege and accordingly confine our analysis to that privilege because the OCC has not asserted any specific privilege beyond the bank examination privilege.

The "bank examination privilege" is not derived from a statute or regulation, nor is it a doctrine that has been expressly adopted by the Eleventh Circuit or the Supreme Court of the United States.  It is a legal doctrine that has been created or adopted by courts whose cases do not bind our decision making.  *See In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 634 (D.C. Cir. 1992) ("Bank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank. These conditions simply could not be met as well if communications between the bank and its regulators were not privileged."); *In re Bankers Trust Co.*, 61 F.3d 465, 471 (6th Cir. 1995) ("Contrary to the district court's belief, however, the [bank examination] privilege does exist and warrants that the court apply the appropriate test for determining whether the privilege should be honored or overridden.").

Neither Plaintiffs nor the OCC dispute that the bank examination privilege applies to the documents at issue, and so we need not decide today whether the bank examination privilege is a valid legal doctrine in the Eleventh Circuit. Accordingly, we assume without deciding that the privilege exists, and therefore we rely on guidance from other courts for the purpose of assessing whether this privilege, which is not absolute, should be overridden so that Plaintiffs may rely on these documents as evidence in this case.

Plaintiffs and the OCC also appear to agree that the five-part framework originally articulated by Judge Weinstein in the Eastern District of New York should guide our analysis regarding whether the privilege should be honored or overridden. *See In re Franklin Nat'l Bank Securities Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979) (defining the framework); *In re Subpoena*, 967 F.2d at 634 (adopting the framework); *In re Bankers Trust Co.*, 61 F.3d at 472 (same); *Wultz v. Bank of China*, 61 F. Supp. 3d 272, 288-89 (S.D.N.Y. 2013) (same). This line of inquiry holds that the bank examination privilege is not absolute and may be overridden if Plaintiffs demonstrate "good cause" to do so based on the following five factors: (1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and the issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

Regarding the relevance of the documents at issue, the evidence contained therein is undoubtedly relevant to Plaintiffs' case. The complaint alleges only

breaches of the fiduciary duty of care and breaches the fiduciary duty of loyalty, and the content of these documents sheds light directly on those issues because its shows how and why the Bank's regulator was dissatisfied with the Bank's leadership's inability to achieve regulatory compliance.

Regarding the availability of other evidence, the OCC submits that Plaintiffs could instead rely on the books and records of the Bank – i.e., the "raw data" upon which the OCC forms its supervisory conclusions – to prove their claims.  But this suggestion misunderstands the significance of this evidence.  Consider, for example, the Reports of Examination discussed above.  To an extent, it is true that these documents draw upon the Bank's books and records to form supervisory conclusions; however, it is also true that the act of sharing these conclusions with the Bank has independent evidentiary value in this case because these Reports of Examination put the Bank's leadership on notice regarding the ways in which their performance was deficient.  It is one thing to establish the fact that the Bank's board of directors unanimously approved a raise for Defendant Gabina Rodriguez in May 2019, but something substantively different can be established by contextualizing that raise with the fact that, only two months earlier, the Bank's regulator told the Bank that Defendant Gabina Rodriguez was "ineffective" as a leader and the board was "passive" in its management of the Bank.  We therefore disagree that Plaintiffs would be able to find a suitable substitute for the documents at issue here.

Regarding the seriousness of the litigation and the role of government in the litigation, the Court must acknowledge that, when the President of the United States

9

chooses to impose sanctions on a foreign government in response to documented human rights abuses, the President does not make that decision lightly. International sanctions promulgated by executive orders are serious business, and so too is the allegation that the leadership of an American bank conspired with a foreign government to retain access to the American banking system despite an executive order to the contrary.  "[P]rivate lawsuits can, by virtue of the statutory rights upon which they rely, be so 'infused with the public interest' that the distinction between private civil suits and public enforcement actions is of reduced significance." *Wultz*, 61 F. Supp. 3d at 290 (quoting *Lynde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013)).  Here, the OCC found on multiple occasions that the Bank's management was deficient.  Indeed, the OCC expressly stated that the Bank's ineffective management of the Banco de Venezuela account significantly increased the risk that the Bank allowed international transactions that violated Executive Order 13808 of August 24, 2017.  Moreover, on multiple occasions, the OCC expressed concern that the Bank's leader, Defendant Gabina Rodriguez, was biased toward the Venezuelan government in a way that was contrary to the interests of the Bank.  We therefore find that the seriousness of this litigation calls for some sunlight into the way our federal government regulates our national banks.

Finally, regarding the risk of chilling the speech of future government regulators, we find that risk to be considerably low.  The bank examination privilege has never been absolute, and so regulators have always known that there was a risk that their statements could one day become public.  The OCC hangs its hat on the

importance of candor between the Bank and its regulator, but this notion is somewhat belied by the fact that, in revoking Defendant Cesar Gomez Valero's citizenship waiver, the OCC itself found that he had been *dishonest* with the regulator about his connection to the Venezuelan government. [D.E. 250-8 at 4]. As the *Wultz* court noted, "[t]here must be cases in which the other factors discussed above outweigh the public interest in candor between banking regulators and banks." *Id*. That was one such case, and we agree with Plaintiffs that this is one as well. Plaintiffs' motion, [D.E. 250], is therefore GRANTED and the OCC's privilege is OVERRULED. The documents are, however, subject to the protective order already entered in this case, meaning especially that they cannot be shared or disseminated outside the immediate scope of this case. And at the conclusion of the case, they shall be returned to the OCC or otherwise destroyed.

## C. *The motions to strike and to disqualify Plaintiffs' counsel.*

Because we find that good cause exists to overrule the OCC's assertion of privilege over the documents discussed in Section II(B) of this Order, and because Defendants' motion to disqualify Plaintiffs' counsel, [D.E. 319], and motion to strike, [D.E. 320], are both premised entirely on the alleged impropriety regarding Plaintiffs' use of those "privileged" documents, these motions are DENIED AS MOOT. Additionally, because it appears that Defendants mistakenly filed their motion to strike twice, their duplicative motion to strike, [D.E. 321], is also DENIED AS MOOT.

### D.   *The motions related to expert testimony.*

The parties have filed multiple motions relating to the admissibility of expert testimony pursuant to *Daubert v. Merrell Dow Pharm., Inc*, 509 U.S. 579 (1993) and its progeny.  Accordingly, after reviewing the applicable standard governing these motions, the Court will explore each argument in turn.

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony.  *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005).  As explained in *Daubert,* the admissibility of expert testimony is governed by Rule 702.  The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence.[3]  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is

---

[3]    Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.").

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as gatekeeper, a court's duty is not to make ultimate conclusions as to the persuasiveness of the proffered evidence. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to the aforementioned requirements as the "qualification," "reliability," and "helpfulness" prongs and, while they remain distinct concepts, the courts must take care not to conflate them. *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at 580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

"[T]he objective of [the gatekeeping role] is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

### 1. *Plaintiffs' Daubert motion regarding Defendants' foreign law experts [D.E. 257].*

Defendants seek to introduce the testimony of two foreign law experts: (1) Eric R. de Vries, a purported expert on the laws of Curaçao; and (2) Carlos Enrique Mouriño Vaquero, a purported expert on the laws of Venezuela. Plaintiffs seek to exclude this testimony and, with one exception, their argument for exclusion can be essentially condensed into one word – irrelevant.  But this testimony is not irrelevant.

The Bank is controlled by its majority shareholder, Mercorp, a company organized under the laws of Curaçao, and Mercorp is in turn controlled by Corpofin, a company organized under the laws of Venezuela that has been subjected to an administrative receivership by the Venezuelan government since the 1990s. Plaintiffs allege that this receivership is illegal and, moreover, that this illegal receivership is ultimately how Defendant Gabina Rodriguez gained control over the Bank during the relevant time period.  Part of the dispute in this case directly

15

concerns the propriety of how the Bank's board of directors allowed Defendant Gabina Rodriguez to exercise that control, and so we cannot agree that expert testimony bearing on the legality of that control is irrelevant to the issues in dispute. We also cannot agree that its probative value is outweighed by the risk of unfair prejudice or confusion of the issues. As we discuss below, the issues that are central to this trial – i.e., whether Defendants breached their fiduciary duties under Florida law – are inextricably intertwined with the Bank's connections to Curaçao and, more prominently, to Venezuela. Accordingly, Defendants should be afforded the opportunity to defend themselves against these allegations by informing the factfinder about their understanding of the legality of the Bank's unique ownership structure. In other words, this expert testimony is not only relevant but indeed central to the defenses asserted in the case.

Plaintiffs only attack on Defendants' experts that could fairly be described as a *Daubert* challenge relates to one issue opined on by one expert. Plaintiffs submit that Mr. Mouriño's opinions on Venezuelan law are unreliable because, at his deposition, he declined to unequivocally confirm whether the "rule of law" exists in Venezuela. Plaintiffs do not challenge Mr. Mouriño's qualifications or the substance of his discussion regarding what Venezuelan law requires; instead, they challenge the reliability of Mr. Mouriño's testimony because he was reluctant to definitively state whether the laws he discusses are, in a very broad sense, actually being followed and/or enforced by Venezuelan authorities. We do not believe that Mr. Mouriño's understandable reluctance to state without qualification whether the "rule of law"

16

exists in Venezuela jeopardizes the reliability of his testimony to such an extent that it must be excluded. Indeed, "expert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is determined." *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 713 (5th Cir. 1999). Plaintiffs' attempt to fault a foreign lawyer for answering a broad question with the phrase "it depends" is therefore unpersuasive. To the extent Plaintiffs wish to highlight the expert's reliability on cross-examination they will be free do so. This motion, [D.E. 257], is DENIED.

### 2. *Defendants' Daubert motion regarding Plaintiffs' expert C. Wayne Crowell [D.E. 258].*

Unlike Plaintiffs' *Daubert* motion, Defendants attack Plaintiffs' expert C. Wayne Crowell on all three fronts – qualification, reliability, and helpfulness. Despite the amalgam of arguments, however, we find none to be persuasive.

In the first place, Mr. Crowell is undoubtedly qualified to discuss issues concerning banking operations. He has decades of experience working as both a bank regulator and a bank consultant. And so, in the context of this case, the Court finds that Mr. Crowell has the requisite qualifications to offer opinions relating to whether Defendants were deficient in meeting their leadership obligations and, if so, whether those deficiencies caused quantifiable harm to the Bank. Additionally, given the complexity inherent in national bank regulation (and the rarefied skills required for bank leadership), we are persuaded that his testimony will assist the trier of fact in understanding what fiduciary duties were owed by Defendants, whether Defendants'

conduct failed to sufficiently meet those duties and, if so, whether that insufficient conduct hurt the Bank in cognizable way.

 The crux of Defendants' remaining argument goes to whether Mr. Crowell employed a reliable methodology to reach his conclusions.  This argument requires some temporal context before its merit (and lack thereof) can be fully appreciated.  In short summary, Plaintiffs did not receive all the discovery relevant to Mr. Crowell's analysis until after the deadline for the disclosure of expert reports.  Hence Mr. Crowell submitted his initial report in a timely fashion and based his opinion on an incomplete factual record, which was largely comprised of documents that were publicly available or otherwise within the control of Plaintiffs.  Plaintiffs expressly reserved the right to supplement Mr. Crowell's initial report after they received a complete production of relevant documents that were requested during discovery.

Then Defendants finally completed their discovery productions and, before Mr. Crowell was able to review that discovery, Defendants deposed him regarding the contents of his initial report.  After the close of expert discovery (and subsequent to his deposition), Mr. Crowell authored a supplemental report that analyzed documents culled from Defendants' full discovery production.  Unsurprisingly, the supplemental report – which relies on information that was not provided by Defendants until after the initial report was drafted – reaches different conclusions than the initial report.

Targeting this discrepancy in opinion between the two reports, Defendants now argue that Mr. Crowell's methodology is unreliable.  We disagree.  Mr. Crowell's

supplemental report is not chock full of contradictions, as Defendants maintain. Our review of the two reports shows, instead, that the supplemental report merely includes revisions based upon new information. At the end of the day, Mr. Crowell's methodology is legally sound because he is forming opinions by relying on the specialized knowledge that he has acquired through working as a banking regulator and consultant for many years to interpret information documenting the Bank's financial condition and its compliance with applicable regulations. Defendants' complaints regarding Mr. Crowell's analysis may prove useful on cross-examination, but they are insufficient to keep Mr. Crowell off the witness stand. This motion, [D.E. 258], is DENIED.

### 3. *Defendants' renewed Daubert motion regarding Plaintiffs' expert Adam M. Smith [D.E. 267].*

This is the second *Daubert* motion levied at Plaintiffs' expert Adam M. Smith, a specialist in the law of international sanctions and the inner workings of the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). The Court previously allowed Mr. Smith's testimony at the preliminary injunction hearing over Defendants' objection using the relaxed *Daubert* standard applicable to such proceedings. [D.E. 166]. Here, Defendants recycle many of their previous arguments and accuse Mr. Smith of being unqualified, unreliable, and unhelpful. We find each argument unpersuasive.

As we have previously discussed, Mr. Smith is immensely qualified to discuss matters relating to OFAC and international sanctions regimes. Defendants do not challenge Mr. Smith's qualifications on these subjects and instead submit that Mr.

Smith is not qualified to serve as an expert on Venezuelan law and corporate law. But Plaintiffs are not offering Mr. Smith as an expert on Venezuelan or corporate law; his expert testimony is limited to OFAC- and sanctions-related issues.  Given the nature of this case, Mr. Smith does occasionally discuss his understanding of the facts in this case as they have been presented to him – e.g., Venezuelan receiverships, corporate shareholder meetings – but those facts merely serve as context for his analysis in areas of law that he is obviously qualified to opine about.

Regarding the reliability of his opinions, Defendants submit that Mr. Smith's analysis is based on an incomplete review of the relevant evidence in this case because it appears that Mr. Smith omitted several communications between the Bank and OFAC from the list of materials that he relied upon in forming the opinions detailed in his expert report.  It is no secret, however, that Mr. Smith *did* review these communications in preparing his opinions for this case because Defendants provided Mr. Smith with those communications the night before Mr. Smith testified at the preliminary injunction hearing and he then confirmed at the hearing that he reviewed those communications.  Accordingly, Mr. Smith's failure to cite these communications in his expert report is, at best, an oversight that warrants cross-examination instead of exclusion.  *See, e.g., Milana v. MSC Cruises, S.A.*, No. 20-cv-21482, 2022 WL 4767701, at *7 (S.D. Fla. Aug. 8, 2022) (noting that typographical errors in an expert report go to the weight of the evidence and not its admissibility); *Walbridge Aldinger Co. v. Aon Risk Servs., Inc. of Pennsylvania*, No. 06-cv-11161,

2007 WL 1219036, at *1 (E.D. Mich. Apr. 25, 2007) ("Minor omissions, however, do not support striking an expert's report.").

Defendants' remaining challenges to the reliability of this expert's conclusion are all belied by the proper standard that the Court imposes on a *Daubert* challenge. As the Eleventh Circuit recently reminded us once again, "as in many other realms of trial procedure, admissibility is a lower bar to clear than credibility. Much like the proper cure for incredible but admissible testimony is vigorous cross-examination, the proper cure for sufficiently reliable but allegedly "shaky" [expert] evidence is not exclusion, but '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *United States v. Ware*, No. 21-10539, 2023 WL 3743892, at *12 (11th Cir. June 1, 2023) (quoting *Daubert,* 509 U.S. at 596).

Plus, given Defendants' decision to change counsel after the preliminary injunction hearing, their claimed confusion regarding whether Mr. Smith reviewed these communications is somewhat understandable – but one must wonder why Defendants chose to not depose Mr. Smith and thereby alleviate this confusion while expert discovery was ongoing. Their decision not to do so does not translate into cause to strike the expert on this basis.

Finally, Defendants argue that Mr. Smith's testimony would not help the trier of fact because, in their view, Mr. Smith occasionally makes impermissible legal conclusions regarding the issues in this case. Defendants cite to four paragraphs in Mr. Smith's expert report – ¶¶ 27, 31, 35, and 44 – as examples of his legal conclusions.

In each of these paragraphs, however, Mr. Smith is either explaining the substance of an OFAC license in his own words or opining on the practical effect of an OFAC license based upon his relevant knowledge and experience regarding how OFAC licenses work within the broader context of an international sanctions regime. Consider paragraph 35, for example, where Mr. Smith opines that two OFAC licenses could not have authorized certain actions taken by the Bank's largest shareholder, Mercorp, because the OFAC licenses were not issued until *after* those actions were taken. Here, it is obvious that Mr. Smith is drawing upon his knowledge of this complex area of law to opine on the practical effect of the Bank's OFAC licenses because OFAC regulations prescribe a general rule against retroactive licenses. *See* 31 C.F.R. § 510.502(a) ("No license or other authorization contained in this part, or otherwise issued by OFAC, authorizes or validates any transaction effected prior to the issuance of such license or other authorization, unless specifically provided in such license or authorization."). And while this opinion surely qualifies as a legal conclusion, it nonetheless informs the factfinder regarding whether Defendants may have breached their fiduciary duties to the Bank. *See, e.g., United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) ("Indeed, courts and commentators have consistently concluded that expert testimony that ordinarily might be excluded on the ground that it gives legal conclusions may nonetheless be admitted in cases that involve highly technical legal issues.") (collecting cases).

We find that the immensely complicated nature of the sanctions regime against the Venezuelan government justifies giving Mr. Smith some leeway to opine on the

legal effect of the OFAC licenses at issue in this case, and so we decline to strike the testimony of a legal expert simply because his legal analysis yields a legal conclusion.

For all these reasons, this motion, [D.E. 267], is meritless and thus DENIED.

### 4.     *Defendants' motion in limine to exclude the testimony of Plaintiffs' expert C. Wayne Crowell [D.E. 279].*

Here, Defendants repackage many of their arguments that this Court found unpersuasive in Section II(D)(2) of this Order.  In trying to exclude the contents of Mr. Crowell's supplemental report, however, Defendants do offer one new procedural argument, to wit: Mr. Crowell's belated disclosure of his supplemental report violated Federal Rules of Civil Procedure 26 and 37 and therefore the testimony reflected in the supplemental report should be excluded at trial or for summary judgment proceedings.

Rule 26(a)(2)(B) required Mr. Crowell to provide a written report, which he did in a timely fashion.  Rule 26(e) further obligated Mr. Crowell to supplement his report by the time that Plaintiffs' pretrial disclosures were due if he learned that his initial report was materially incomplete, which he also did in a timely fashion.  Thus, at first blush, Defendants' argument that Mr. Crowell's supplemental report should be stricken from the record pursuant to Rule 37(c) appears meritless.  But Defendants go further, arguing that the supplemental report expands the analysis of the initial report to such a degree that it cannot fairly be considered a supplement.  Having reviewed the reports themselves and the underlying record, the Court disagrees and finds that Mr. Crowell's supplemental report qualifies as a timely supplement under Rule 26 and is therefore not subject to Rule 37(c)'s exclusionary rule.

Even assuming that Rule 37(c) did apply to this report, however, Defendants' argument still misses the mark because Plaintiffs' alleged failure to comply with Rule 26 with respect to Mr. Crowell's report was substantially justified.  In determining whether to exclude evidence pursuant to Rule 37(c), courts in this District consider the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *See Joslyn v. Essentia Natural Memory Foam, Inc.*, No. 16-cv-81424, 2017 WL 5434583, at *2 (S.D. Fla. Jan. 25, 2017) (collecting cases).

Regarding the surprise to Defendants, there was none.  Plaintiffs informed Defendants at the time of serving Mr. Crowell's initial report that it could be supplemented after Plaintiffs received relevant discovery from Defendants.  In other words, Defendants knew that this supplement was coming because of the timeline of discovery in the case and Plaintiffs' express representations made in conjunction with the service of Mr. Crowell's initial report.

Regarding the ability of Defendants to cure the surprise, they could have easily obtained Plaintiffs' consent to depose Mr. Crowell again or otherwise sought this Court's intervention to make that happen.  But Defendants did not do this, and instead they chose to showcase the supplemental report as evidence of Mr. Crowell's unreliable methodology in their *Daubert* motion.

24

As to the extent to which this evidence would disrupt the trial, we find that it would cause no disruption whatsoever.  In January, Defendants produced the documents that Mr. Crowell relied on in his supplemental report and they did so with the knowledge that Mr. Crowell would need a substantial amount of time to review those documents and augment his original analysis accordingly – a process that he completed months ago.

With respect to the importance of this evidence, the Court finds that this evidence is critically important.  Mr. Crowell opines on the central issues in this case – i.e., the nature of Defendants' fiduciary duties, how Defendants' actions may have been deficient, and whether those deficiencies caused harm to the Bank.  In sum, Defendants seek to avoid the introduction of evidence concerning the harm they may have caused the Bank by preventing Plaintiffs' expert from discussing his analysis of the financial condition of the Bank.  The supplemental report contains important evidence and it should not be excluded.

Finally, regarding Plaintiffs' explanation for disclosing the supplemental report when it did, we find their explanation sufficient.  Mr. Crowell's initial report was due *before* Plaintiffs received a voluminous production of internal documents from Defendants that detailed the Bank's financial condition.  After receiving and reviewing this relevant information, Mr. Crowell revised his analysis and submitted his supplemental report.  Thus, even if we agreed with Defendants that the Rule 37(c) was implicated here, we do not agree that its exclusionary rule is warranted.  This motion, [D.E. 279], is also DENIED.

**E.**       *The remaining motions in limine.*

The purpose of a motion *in limine* is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence without lengthy argument at, or interruption of, the trial. *See, e.g., Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). Under the Federal Rules of Evidence, evidence is considered relevant if it has the tendency to make a fact of consequence more or less probable. *See* FED. R. EVID. 401.

The Federal Rules of Evidence permit the exclusion of relevant evidence when the probative value is substantially outweighed by danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and/or needlessly presenting cumulative evidence. FED. R. EVID. 403. Courts are cautioned to use Rule 403 sparingly, in part because the Federal Rules of Evidence favor admission of evidence and in part because relevant evidence can be inherently prejudicial. *See, e.g., United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (collecting cases). The term unfair prejudice in and of itself speaks to the ability of a piece of relevant evidence to lure the fact finder into declaring a party's liability on grounds other than specific proof of the offense charged. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997). But it also signifies an undue tendency to suggest liability on an improper basis, commonly an emotional one. *See id.* In the context of a Rule 403 balancing test, the more essential the piece of evidence is to a case, the higher its probative value; the higher a piece of evidence's probative value, the less

26

likely it should be excluded on Rule 403 grounds. *See King*, 713 F.2d at 631. The parties have filed a handful of motions *in limine*, and so each will be examined in turn.

### 1.   *Plaintiffs' omnibus motion in limine [D.E. 278].*

Plaintiffs seek to exclude three categories of evidence from trial: (1) evidence relating to two other judicial proceedings in Florida involving Plaintiffs' principal, Juan Santaella; (2) evidence relating to agreements and/or business transactions between Plaintiffs and a prospective group of investors; and (3) evidence relating to the funding of this litigation.

### a.   *Other judicial proceedings.*

Mr. Santaella, Plaintiffs' principal, was involved in two judicial proceedings in the Southern District of Florida that Plaintiffs seek to preclude Defendants from referencing during the trial. Mr. Santaella was a defendant in *FOGADE v. ENB Revocable Trust*, Case No. 96-01679 (S.D. Fla. 1996), and he was the bankruptcy debtor in *In re Santaella*, Case No. 00-16366 (Bankr. S.D. Fla. 2000). Plaintiffs argue that these proceedings, which concluded more than two decades ago, are irrelevant to the issues raised in our case and do not survive the balancing test prescribed by Rule 403. We are not so sure.

The core issue in this lawsuit is whether Defendants breached their fiduciary duties to the Bank, and one theory of breach alleged by Plaintiffs concerns Defendants' rejection of certain capitalization opportunities submitted by an investor group comprised of Loop Bank, Greg Jacobson, and Eric Donnelly (the "Investor

Group).  The record reflects that the early offers to invest in the Bank included Plaintiffs and/or their principals among the Investor Group; however, later offers did not contemplate the inclusion of Plaintiffs and/or their principals.  All these capitalization offers were rejected by Defendants who were aware at the time of rejection that the Investor Group was connected to Plaintiffs and therefore Mr. Santaella.  Because the FOGADE litigation directly concerns Mr. Santaella's historical involvement with the Bank, it is at least relevant to the issue of whether Defendants breached their fiduciary duties to the Bank by rejecting capitalization offers submitted by investors with whom Mr. Santaella was affiliated. Indeed, in disqualifying Defendants' counsel, this Court already held that the FOGADE litigation was substantially related to this lawsuit.  Thus, the Court rejects Plaintiffs argument that discussion of the FOGADE litigation is irrelevant and that its probative value is outweighed by the risk of unfair prejudice and confusion of the issues.  The precise contours of how and when reference is  made to this litigation is up to the trial judge.  He may limit its use to impeachment or he may allow substantive evidence to be introduced if a foundation can be laid.  But such matters are left for trial and should not be adjudicated in an in limine motion.

Regarding the bankruptcy case, wherein Mr. Santaella was found to have perjured himself, we find that this is again relevant to Defendants' decision to reject capitalization opportunities submitted by a group of investors with ties to Mr. Santaella.  In other words, Mr. Santaella's history of untruthfulness is not only fodder for Rule 608(b) impeachment because it adds context to a decision made by the Bank's

board of directors that is now under derivative attack.  And here again, the Rule 403 balancing test tips in favor of allowing this evidence in because it at least indirectly relates to a central issue in the case.  And for purposes of impeachment the litigation is most certainly relevant.  Indeed it is likely that this information would be presented during the cross-examination of Mr. Santaella if he takes the witness stand, and discussion of the matter need not result in the re-litigation of a case that has been closed for more than 20 years.  This portion of Plaintiffs' omnibus motion, [D.E. 278], is therefore DENIED.

> b.  *Agreements with the Investor Group.*

Plaintiffs are affiliated with the Investor Group in a variety of ways because they have collaborated during prior attempts to purchase a controlling interest in the Bank and during this litigation.  Accordingly, Plaintiffs seek to exclude any discussion of the agreements between themselves and the Investor Group that pre-dated and post-dated the instigation of this lawsuit.  Plaintiffs submit that these agreements are irrelevant to the issues in the case; to some extent, we are inclined to agree.

Although it is not disputed that Defendants were aware of the Investor Group's connection to Mr. Santaella when certain capitalization offers were rejected, the record does not reflect that Defendants were privy to the precise details of their relationship until receiving information on that topic from Plaintiffs (and members of the Investor Group) during discovery.  Accordingly, from a temporal perspective, Defendants could not have relied on this information when they decided to reject

capitalization offers from the Investor Group.   This information is therefore irrelevant to whether the decision to reject these offers constituted a breach of Defendants' fiduciary duties.   Insofar as evidence relating to the affiliation between Plaintiffs and the Investor Group is concerned, the only relevant evidence is that which was available to Defendants during their review of the Investor Group's capitalization offers.   Evidence not obtained until after this litigation began is irrelevant and therefore inadmissible under Rule 402.

On the other hand, one of Defendants' affirmative defenses, which is subject to a pending motion for summary judgment, concerns Plaintiffs' alleged "improper motive" in bringing this derivative lawsuit.   Assuming that this affirmative defense survives summary judgment, then evidence documenting the collaborations (and substantive motivations) of Plaintiffs and the Investor Group are potentially relevant to and probative of that affirmative defense.   And based on the parties' description of the evidence at issue, we have little trouble concluding that its probative value outweighs the relevant Rule 403 risks.   If this affirmative defense is rendered moot on summary judgment, however, then this evidence would be wholly irrelevant and therefore inadmissible.   Thus, this portion of Plaintiffs' omnibus motion, [D.E. 278], is GRANTED in part and DENIED in part.

### c.   *Litigation funding.*

Plaintiffs maintain that their counsel have accepted this case on a contingency-fee basis and that the Investor Group has helped cover some of the costs of the litigation.   Plaintiffs seek to exclude any reference to the source of this litigation's

funding because it is irrelevant and unfairly prejudicial.  We agree that litigation funding has no bearing on whether Defendants breached their fiduciary duties and so it should be excluded as irrelevant.  And, even assuming that Defendants' "improper motive" defense survives summary judgment, we cannot agree that litigation funding is probative of a litigant's "improper" motivation to instigate a derivative lawsuit because the fact that the Investor Group covered some legal costs speaks only to *how* the lawsuit progressed as a practical matter and not *why* it was brought in the first place.  Accordingly, the only instance in which we can imagine that evidence regarding this litigation's funding is properly admissible would be to challenge the credibility of a potentially biased witness.  *See, e.g., United States v. Abel*, 469 U.S. 45, 49 (1984).  Thus, this portion of Plaintiffs' motion, [D.E. 278], is GRANTED in part and DENIED in part.

### 2. *Defendants' motion in limine to exclude evidence concerning Venezuela and its Government [D.E. 281].*

Given the context of this case, Defendants' attempt to exclude all references to the Venezuelan government as irrelevant and unfairly prejudicial is absurdity approaching frivolity.  Defendants' alleged loyalty to the Venezuelan government in a manner that is contrary to the interests of the Bank is a central issue in this case.  We therefore disagree that evidence bearing on Defendants' connections to the Venezuelan government is irrelevant.  Moreover, because of the centrality of this issue, we cannot agree that introducing evidence probative of Defendants' ties to the Venezuelan government would invite unfair prejudice that might cause a properly

instructed jury to find in favor of Plaintiffs simply because they dislike the Venezuelan government.

Defendants submit that the only evidence bearing upon Defendants' improper ties to the Venezuelan government takes the form of improper "lay opinion" testimony because it is espoused by a witness who lacks first-hand knowledge. Although such evidence is inadmissible under Rule 701, the record reflects that this is not the *only* evidence concerning Defendants' ties to the Venezuelan government. Accordingly, and provided that the evidence is otherwise admissible, Plaintiffs may introduce evidence concerning Defendants' ties to the Venezuelan government – including the seven categories of evidence identified on pages 8-9 of Defendants' motion *in limine* – without offending Rules 401, 402, or 403. This motion, [D.E. 281], is therefore DENIED.

### 3. *Defendants' motion in limine to exclude evidence relating to non-public OCC records [D.E. 282].*

Defendants first submit that, because the "non-public OCC information" that we discussed in Section II(B) of this Order is privileged, it should be excluded from trial. Having concluded that good cause exists to override the privilege attached to that "non-public OCC information," we reject this argument without further analysis.

Next, Defendants argue that, even if these documents were not privileged, they should still be excluded because they are irrelevant and their probative value is outweighed by the risk of unfair prejudice. They submit that, because some of the documents have been rescinded by the OCC, the documents are irrelevant and lack any probative value. We again disagree. Having reviewed these documents, we have

no doubt that these documents are both highly relevant to and remarkably probative of the central issues in this case. These documents do not lose all probative value simply because some of them were subsequently rescinded by the OCC. To be sure, a decision by the OCC to reverse course may undercut the evidentiary value of a rescinded document in the eyes of a juror, but it does not erase all probative value therein. The fact that the OCC said one thing and then said the opposite can be, in and of itself, informative. In other words, OCC contradictions go to the weight of the evidence – not its admissibility.

Defendants further complain that the "unilateral" use of the 31 documents described in Section II(B) of this Order by Plaintiffs would result in unfair prejudice because Plaintiffs did not move to override the privilege attached to the OCC documents that subsequently rescinded one or more of those 31 documents. When the OCC asserted its privilege over those documents, it specifically noted that one of those documents – i.e., the letter to Defendant Gabina Rodriguez dated July 29, 2020, which revoked her citizenship waiver and thereby mandated her removal from the Bank's board of directors – had been rescinded by the OCC. Given that the OCC asserted its privilege over a document that was subsequently rescinded, we construe its assertion of privilege to additionally cover the document that comprise its final word. Put differently, we find that the OCC's assertion of privilege in this case was broader than the 31 documents identified by Plaintiffs and therefore covered all documents that rescinded any information contained within the 31 documents adjudicated above.

For the reasons discussed in Section II(B) of this Order, the Court additionally finds good cause to override the bank examination privilege attached to any OCC document that subsequently rescinded information contained in those 31 documents. We find further support for this decision in Rule 106, which provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time." Thus, for example, Defendants may rely on the OCC communication that rescinded its letter to Defendant Gabina Rodriguez dated July 29, 2020.  We agree with Defendants that it would be unfair to allow Plaintiffs to introduce these documents in a vacuum that inaccurately presents certain statements by the OCC as the final word of the Bank's regulator.  But, given the importance of this evidence to the central issues in this case, the solution is not to exclude the 31 documents; rather, it is to admit the evidence that directly contradicts those documents.  And we note as well that if any undue prejudice can be imagined from the jury's consideration of any such documents, a limiting instruction can be requested from the presiding Judge at the appropriate time.

For purposes of this motion, [D.E. 282], it lacks merit and is DENIED.  The bank examination privilege with respect to contradictory OCC documents is also OVERRULED for the reasons fully set forth above.

###### 4. *Defendants' motion in limine to exclude evidence relating to OCC consent orders [D.E. 283].*

The OCC has subjected the Bank to two consent orders since 2018. Defendants offer three reasons for excluding these consent orders and any discussion relating thereto: (1) the evidence is irrelevant pursuant to Rule 402; (2) the evidence's probative value is outweighed by the potential for unfair prejudice, confusion of the issues, or misleading the jury pursuant to Rule 403; and (3) the evidence is inadmissible as a compromise or settlement pursuant to Rule 408.

The consent orders are undoubtedly relevant. Defendants are being sued for breaching their fiduciary duties to the Bank, and the consent orders are probative of Defendants' knowledge regarding the Bank's regulatory compliance obligations. Additionally, the consent orders are relevant because these documents lay an evidentiary foundation for Plaintiffs' damages calculation.

The consent orders also survive Rule 403 scrutiny. We find that there is no cognizable risk of unfair prejudice, confusion of the issues, or misleading the jury that can flow from the introduction of and discussion about these consent orders. Plaintiffs are not asking the jury to enforce the consent orders or to find that the OCC's findings therein are true; rather, Plaintiffs are simply asking the jury to consider the consent orders in context with other evidence to assess whether Defendants' conduct has violated Florida law. Defendants fear that the jury will conflate the Bank with its board of directors and thereby conclude that, because the Bank got in trouble, Defendants must have done something wrong; however, this fear

can easily be absolved with jury instructions and arguments from counsel that highlight the distinction between an entity and the people who manage that entity.

Finally, Defendants submit that exclusion of the consent orders is required by Rule 408, which provides:

> **(a) Prohibited Uses.** Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> > (1) furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > (2) conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> **(b) Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

FED. R. EVID. 408.

This rule covers settlement agreements as well as statements made during settlement negotiations. *See, e.g., Westchester Specialty Ins. Services, Inc. v. U.S. Fire Ins. Co.*, 119, F.3d 1505, 1512 (11th Cir. 1997) (discussing the applicability of Rule 408 to settlement agreements). The test for whether statements merit exclusion under Rule 408(a) is "whether the statements or conduct were intended to be part of the negotiations toward compromise." *Blu-J, Inc. v. Kemper C.P.A. Group*, 916 F.2d 637, 642 (11th Cir. 1990) (quoting *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106 (5th Cir. 1981)).

The problem with Defendants' argument is that there is nothing in the record that reasonably suggests that these consent orders were the product of a "compromise" or "settlement" between the Bank and the OCC regarding disputed claims. Indeed, there is nothing in the record to suggest that the Bank ever *disputed* any of the claims made by the OCC regarding the Bank's failure to comply with applicable regulations. By contrast, based upon the face of the consent orders, it appears that the Bank affirmatively chose *to not dispute* the claims made by the OCC because it wanted to "cooperat[e]" with the OCC and avoid the "costs associated with administrative and judicial proceedings" relating to those claims. [D.E. 283-1 at 25; D.E. 283-2 at 1]. The consent orders, by their own terms, are not "contract[s]." [D.E. 283-1 at 23, 25; D.E. 283-2 at 30]. Moreover, the consent order from 2018 expressly precludes the Bank from contending that the consent orders constitute a "compromise" or "settlement" between the Bank and the OCC. [D.E. 283-1 at 28-29]. But for the fact that the consent order from 2020 supersedes the consent order from 2018, [D.E. 283-2 at 2], we would query whether Defendants' argument here actually jeopardizes their compliance with the OCC's mandate. The consent order from 2020 does not preclude the Bank from contending that the consent order constitutes a "compromise" or "settlement"; however, the consent order from 2020 does expressly state that it is *not* a "compromise" or "settlement." [D.E. 283-2 at 28].

The Eleventh Circuit has "rejected the notion" that, where there is no evidence that a claim has ever been disputed, the undisputed acquiescence to a claim of liability qualifies as a compromise within the meaning of Rule 408. *See Preis v.*

37

*Lexington Ins. Co.*, 279 F. App'x 940, 943 (11th Cir. 2008) (citing *Dallis v. Aetna Life Ins. Co.*, 768 F.3d 1303, 1307 (11th Cir. 1985)).   In *Preis*, because an insured submitted a claim to his flood insurers and "received the full policy limits from both of them absent any dispute as to the validity of his claim," the district court did not abuse its discretion by finding that Rule 408 did not bar the admissibility of evidence documenting the payments made by the flood insurers.  *Id.*

Similarly, here aside from a boilerplate declaration in the consent orders that the Bank neither admits nor denies any wrongdoing, [D.E. 283-1 at 26; D.E. 283-2 at 2], Defendants offer nothing to show that the Bank ever disputed the claims made by the OCC.   And the declaration that the Bank neither admits nor denies any wrongdoing cannot save Defendants' argument because, by declining to admit or deny the validity of claims of wrongdoing and then entering into a stipulated cease-and-desist order, the Bank effectively declined to dispute the OCC's claims and chose instead to acquiesce to the demands of the claimant.   In the insurance context, the Eleventh Circuit has found that such actions do not fall within the scope of Rule 408.   And so, because there is no evidence of dispute-and-compromise regarding these consent orders, we cannot say that Rule 408(a) justifies the exclusion of the consent orders in this case.

But even assuming that Rule 408(a) did apply, these consent orders would still be admissible for purposes other than proving the validity of the claims made by the OCC in the consent orders because of the exception provided by Rule 408(b).  For example, the consent orders could be used to prove Defendants' knowledge regarding

the Bank's regulatory compliance obligations. *See United States v. Austin*, 54 F.3d 394, 400 (11th Cir. 1995) (finding that the defendant's settlement agreement with the Federal Trade Commission properly evidenced his knowledge that his actions were not compliant with the settlement agreement); *United States v. Hauert*, 40 F.3d 197, 200 (7th Cir. 1994) ("The evidence was [properly] admitted to show whether Hauert knew 'what the law is' and his 'legal duty' thereunder."); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, (E.D.N.Y. 2006) (admitting a consent decree over a Rule 408 objection for the limited purpose of "showing that Wal-Mart was aware of its obligations under the ADA"). Or it could be used to lay an evidentiary foundation for the opinions of Plaintiffs' experts. *See Austin*, 54 F.3d at 400 ("Moreover, the facts from the FTC case . . . laid the evidentiary foundation for many of the government exhibits in the criminal proceeding."). The motion, [D.E. 283], is DENIED. And again if appropriate the Defendants can seek a limiting instruction when the evidence is presented at trial that addresses any argument that the introduction of this evidence could mislead the jury and focuses them on the true purposes for its admission.

### III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

A.   Plaintiffs' motion for an extension of the discovery deadline [D.E. 219] is **DENIED**;

B.   Plaintiffs' motion to adjudicate a privilege dispute [D.E. 250] is **GRANTED** and the OCC's assertion of privilege is **OVERRULED**;

C.   Plaintiffs' *Daubert* motion [D.E. 257] is **DENIED**;

D.      Defendants' *Daubert* motion [D.E. 258] is **DENIED**;

E.      Defendants' *Daubert* motion [D.E. 267] is **DENIED**;

F.      Plaintiffs' motion *in limine* [D.E. 278] is **GRANTED in part and DENIED in part**;

G.      Defendants' motion *in limine* [D.E. 279] is **DENIED**;

H.      Defendants' motion *in limine* [D.E. 281] is **DENIED**;

I.      Defendants' motion *in limine* [D.E. 282] is **DENIED** and the OCC's assertion of privilege over documents that subsequently rescinded information contained in the 31 documents discussed in Section II(B) of this Order is **OVERRULED**;

J.      Defendants' motion *in limine* [D.E. 283] is **DENIED**;

K.      Defendants' motion to disqualify Plaintiffs' counsel is **DENIED AS MOOT**;

L.      Defendants' motion to strike [D.E. 320] is **DENIED AS MOOT**; and

M.      Defendants' motion to strike [D.E. 321] is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 13th day of June, 2023.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge