UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-20201-DPG

BANCOR GROUP INC., *et al.*,

    Plaintiffs,

v.

GABINA RODRIGUEZ, *et al.*,

    Defendants.

_____

**THE DIRECTORS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION TO OVERRULE OBJECTIONS TO
THE ADMISSIBILITY OF OCC DOCUMENTS [DE 470]**

## **INTRODUCTION**

This Court gave Plaintiffs exactly what they asked for when it overruled the OCC's bank examiner's privilege objection as to 31 privileged documents that were inadvertently produced by the Directors. *See* Omnibus Order [DE 356] at 3-11; 32-34. Now Plaintiffs seek to gaslight the Court into believing that it overruled the privilege objection as to nearly 200 additional OCC-related documents that: a) Plaintiffs never mentioned in their prior motion to adjudicate the OCC's privilege objections, and b) have never been seen or assessed by the Court. Plaintiffs also argue that the Directors have somehow waived their objections to all but a handful of Plaintiffs' OCC exhibits, but that is demonstrably false.

Plaintiffs filed their Expedited Motion to Adjudicate [the OCC] Privilege Dispute[]" [DE 244] on April 7, 2023. In that motion, Plaintiffs explicitly asked this Court to "issue an order overruling the privilege asserted by the OCC *with respect to the documents listed in **Exhibit A***" to their motion. [DE 244] at 19 (italics added). Exhibit A to that motion identified the 31 inadvertently-produced documents. Nothing more.

In its June 13, 2023 Omnibus Order [DE 356], this Court granted Plaintiffs' motion and overruled the privilege as to those 31 documents, as well as to any OCC documents in the Directors' possession that directly contradict Plaintiffs' 31 documents. Omnibus Order [DE 356] at 3-11; 32-34. That was it. Had the Court intended to enter the broad ruling that Plaintiffs now claim, the Court presumably would have overruled the privilege as to *all* OCC documents that either Party might wish to enter into evidence.

The suggestion that the Directors waived their objections to all but 13 of Plaintiffs' proposed OCC-related exhibits fares no better. Setting aside the fact that they could not possibly waive the OCC privilege, which (the Court has acknowledged) belongs to the OCC [DE 356 at 7],

1

the Directors only withdrew their objections to 16 of a batch of 29 OCC letters that had been provided to the Court on October 13, 2023. The 13 documents furnished to the Court the following day could not have possibly encompassed the entire universe of OCC documents to which the Directors object.

And most unhelpfully, Plaintiffs fail to specify which among their 200 OCC-related exhibits they are talking about when they write "the OCC documents at issue". The few documents discussed in their Motion were among those letters furnished to the Court on October 14, 2023, to which the Directors clearly maintained their objections to admissibility.

Finally, as to their subpoena to the OCC, Plaintiffs fail to certify that they adhered to the OCC's *Touhy* regulations – as they were required by law to do – prior to serving their subpoena. And it's not like Plaintiffs lacked sufficient time to do that. Indeed, in early 2023 the Directors followed the OCC's *Touhy* regulations to the letter when seeking an OCC witness to provide deposition testimony, and the OCC rebuffed that request. To suddenly require a witness from the OCC to testify at trial at this point – especially at the end of a trial continuance of seven months – would be highly unusual, not to mention pointless.

## BACKGROUND

Plaintiffs filed this lawsuit in January 2022, accusing the Directors of breaching their fiduciary duties to ENB by, *inter alia*, failing to comply with the terms of two Consent Orders issued by the OCC. But it is undisputed that on the day Plaintiffs filed suit, ENB had complied with nine of the ten action items in the OCC's 2020 Consent Order. Only one action item remained outstanding: recapitalization and a change in control of the Bank.

2

To pursue recapitalization and to create a new supermajority owner, the Directors voted to increase the number of shares of ENB available for sale. This case really boils down to Plaintiffs' disagreement with that decision.

Plaintiffs' claim that they object to the RSU Plan. But the reality is that Plaintiffs' beneficial owner, Juan Santaella, wants to pocket $14.8 million by selling the current supermajority shareholder, Mercorp, to an outside investor. [*See* DE 305-23; 305-17]. But in order to do that Plaintiffs have to *preserve* Mercorp's *status* as the supermajority owner.[1] The Directors' plan to offer new shares to recapitalize ENB and effect a change in control therefore presents a direct threat to Plaintiffs' goals. Thus, when Plaintiffs accuse the Directors of failing to recapitalize the Bank, they mean that the Directors declined *their* recapitalization proposal.

That is why shortly after filing suit Plaintiffs sought a preliminary injunction asking the Court to prohibit the Directors "(1) from taking any action to implement or further effectuate the improper RSU Plan, and (2) from buying, selling, assigning, or otherwise transferring any of the one million new shares of stock issued at the December 17, 2021 shareholder meeting." [DE 6 at 20]. After a three-day evidentiary hearing, Plaintiffs filed an Amended Motion for Preliminary Injunction seeking the same relief. [DE 115 at 21]. The Magistrate Judge denied their motion in a Report and Recommendation dated December 21, 2022. [DE 174]. This Court adopted the Report on April 4, 2023. [DE 239].

Only when it became apparent that their strategy to block the Directors' recapitalization plan had failed did Plaintiffs begin to prosecute discovery by serving each Director with a subpoena duces tecum requesting numerous documents, each of which required a response in less

---

[1] All the while alleging that ENB is improperly controlled by the Venezuelan government through the receivership of Mercorp's shares.

3

than 30 days. [DE 121]. The Directors objected[2] and Plaintiffs agreed to allow the Directors 30 days to respond to the subpoenas. Plaintiffs waited until December 9, 2023 to serve their only Rule 34 request for production.

The Directors, not wishing to upset the then-pending fact-discovery deadline, moved Heaven and Earth to comply with Plaintiffs' production requests over the Christmas and New Year Holidays at the end of 2022 and beginning of 2023. Of course, in litigation no good deed goes unpunished. In the course of producing tens of thousands of pages of documents in a short amount of time, the Directors inadvertently produced 31 documents that contained information protected by the OCC's bank examination privilege.

That should not have been an issue, given that the Parties had stipulated to a Confidentiality Order that included a claw-back provision. [DE 103]. But Plaintiffs refused to comply with the Directors' claw-back demand and refused to comply with OCC's demand to return or destroy the 31 inadvertently-produced documents. They instead filed their Motion to Adjudicate [the] Privilege Dispute[.] [DE 244].[3]

---

[2] *See Doe v. 1031 S. Wooster Ltd.*, Case No. 21-cv-80873, 2022 U.S. Dist. LEXIS 6907, *11 (S.D. Fla. 2022) (holding that the use of a 30(b)(1) deposition notice to demand "production of documents on such an abbreviated schedule absent an order of the court or the parties' stipulation is improper and serves to do an 'end-run' around the discovery rules") (internal quotation marks and citations omitted).

[3] In the meantime, Plaintiffs have withheld 42 OCC-related documents from production based on their assertion of the OCC privilege. *See* Plaintiffs' OCC Privilege Log, attached as Ex. A.

**ARGUMENT**

**I. THE COURT HAS NOT MADE ANY BLANKET RULING ON THE OCC PRIVILEGE OR AS TO THE ADMISSIBILITY OF OCC DOCUMENTS**

This Court has already accepted the validity of the OCC's assertion of the bank examination privilege and has recognized that the OCC is the holder of that privilege. *See* Omnibus Order [DE 356] at 7. It is axiomatic that only the holder of a privilege may waive that privilege. *Cf., Montgomery v. eTreppid Techs., LLC*, 548 F. Supp. 2d 1175, 1177 (D. Nev. 2008) (noting that "[o]nly the holder of the attorney-client privilege may waive it") (citation omitted). Thus, none of the Parties to this case may waive the privilege; only the OCC may do so.

**A. The Court's Omnibus Order [DE 356] Only Addressed 31 OCC-Privileged Documents.**

Plaintiffs repeatedly refer to "the OCC Documents" without specifying what documents they mean. Their exhibit list includes approximately 200 documents containing OCC-privileged information. Plaintiffs seem to expect a blanket ruling on all of their OCC exhibits, but "[t]he Court cannot make a blanket ruling based on unspecified evidence[.]" *SFR Servs., LLC v. Lexinton Ins. Co.*, Case No. 19-cv-229, U.S. Dist. LEXIS 18399, at *9 (M.D. Fla. Feb. 1, 2021).

Shortly after refusing the Directors' claw-back demand and the OCC's directive to return or destroy the inadvertently-produced documents, Plaintiffs filed their April 27, 2023 Expedited Motion to Adjudicate the Privilege Dispute []. [DE 244]. In their introductory paragraph, Plaintiffs announced that they sought "an order from this Court overruling the privilege [] asserted by the [OCC] and allowing Plaintiffs' to use *certain documents produced by Defendants during discovery*." [*Id.* at 1] (emphasis added). Likewise, in their Conclusion Plaintiffs requested "that the Court adjudicate this privilege dispute and issue an order overruling the privilege asserted by the OCC *with respect to the documents listed in Exhibit A*" to their motion. [*Id.* at 19] (italics added).

5

Exhibit A to that motion listed the 31 inadvertently-produced documents. Plaintiffs submitted those 31 documents for *in camera* inspection by the Court.

The Court began its analysis with a summary of the "documents at issue[.]" Omnibus Order [DE 356] at 4. This showed from the outset that the Court clearly limited its analysis to the 31 inadvertently-produced documents submitted by Plaintiffs. Throughout the Order, the Court never varied from referring to the 31 OCC Documents as the "documents at issue" and "these documents[.]" [*Id*. at 3, 4, 6, 7, 8, 9, and 32-34]. As the Court also noted, Plaintiffs did not dispute that "the bank examination privilege applie[d] to the documents at issue." [*Id*. at 8]. This clearly signaled the Court's understanding that it was ruling on the privilege as to a finite set of OCC-related documents.

The Court then applied a balancing test of five factors to determine whether "good cause" existed to overrule the bank examination privilege as to "these documents" submitted by Plaintiffs. [*Id*. at 8-11]. Obviously, the Court could not have applied those factors to documents that were never presented for inspection.

The Court further clarified the scope of its ruling when addressing the Directors' motion in limine:

> We agree with Defendants that it would be unfair to allow Plaintiffs to introduce these documents in a vacuum that inaccurately presents certain statements by the OCC as the final word of the Bank's regulator. But, given the importance of this evidence to the central issues in this case, **the solution is not to exclude the 31 documents; rather, it is to admit the evidence that directly contradicts those documents**.

[*Id*. at 34] (emphasis added).

The Court did not, as Plaintiffs would have it believe, issue a blanket ruling on all OCC documents, sight-unseen, nor could the Court have properly done so. *See SFR Servs., LLC*, U.S.

6

Dist. LEXIS 18399, at *9. Both Plaintiffs' motion and the Omnibus Order were clearly limited in scope to the 31 documents that had been inadvertently produced by the Directors, as well as any documents that the Directors could show as directly contradicting those documents.[4] Any OCC-related documents not covered by the scope of the Court's ruling should be excluded as privileged. If the Court is inclined to consider otherwise, the OCC should be notified and given an opportunity to address any additional documents that Plaintiffs wish to enter into evidence.[5]

### B.     The Directors Have Not Broadly Waived Admissibility Objections to OCC Documents.

Plaintiffs' claim that the Directors waived their objections to all but a handful of OCC documents is nonsense. At the October 13, 2023 pretrial hearing, discussion was had about some letters from the OCC that were on Plaintiffs' exhibit list, some of which, as the Court pointed out, went to ultimate questions of fact. Trancr., [DE 431], at 7:20-25; 22:3-10. The Court asked to see the letters under discussion. [*Id.* at 22:13 – 23:6]. The undersigned transmitted 29 letters that day to the Court. *See* Email dated Oct. 13, 2023, attached as Ex. B.

After further consideration, the Directors decided to withdraw their objections to all but 13 *of that specific group of letters* and transmitted a new document link to the Court on the following day. *See* Email dated Oct. 14, 2023, attached as Ex. C. This was by no means a waiver of all objections to other OCC-related exhibits in Plaintiffs' exhibit list, and certainly not a waiver of the OCC privilege as to documents that were not subject to the Court's Omnibus Order.

---

[4]     The Directors did not object to the Court's ruling as to the OCC privilege because, first, the OCC (which holds the privilege) chose not to object, and second, because the ruling was clearly limited to the 31 documents and any documents that the Directors might offer in rebuttal. This in no way should be construed as a waiver of the privilege as to all OCC-related documents, or as a waiver of any objection to admissibility.

[5]     As far as the Directors are aware, Plaintiffs never sought leave from the OCC via its *Touhy* regulations to use any OCC-privileged documents in this case.

## II. PLAINTIFFS' BURDEN UNDER FLORIDA'S BUSINESS JUDGMENT RULE IS AXIOMATICALLY RELEVANT TO THE ADMISSIBILITY OF EVIDENCE

Plaintiffs make the rather strange argument that the business judgment rule has no bearing on whether evidence is admissible. Mot. at 7. But the scope of what evidence is relevant obviously depends on the elements that Plaintiffs would need to prove in support of their claims. In this derivative lawsuit, Plaintiffs seek to have the Directors found personally liable for damages to ENB for breach of fiduciary duty. The business judgment rule is therefore axiomatically relevant to what evidence should be deemed admissible.

The Florida Legislature has provided a very stringent, two-pronged inquiry for the circumstances under which a director may be held personally liable for money damages:

> (1) A director is not personally liable for monetary damages to the corporation or any other person for any statement, vote, decision to take or not to take action, or any failure to take any action, as a director, unless:
>
> (a) The director breached or failed to perform his or her duties as a director; *and*
>
> (b) The director's breach of, or failure to perform, those duties constitutes any of the following:
>
> 1. A violation of the criminal law. . . ;
>
> 2. A circumstance under which the transaction at issue is one from which the director derived an improper personal benefit, either directly or indirectly;
>
> 3. A circumstance under which the liability provisions of s. 607.0834 [improper distributions] are applicable;
>
> 4. In a proceeding by or in the right of the corporation to procure a judgment in its favor or by or in the right of a shareholder, **conscious disregard for the best interest of the corporation, or willful or intentional misconduct**. . . .

8

§ 607.0831(1), FLA. STAT. (emphasis added). Of these provisions, only subsections (1)(b)2 ("improper personal benefit") and 4 ("conscious disregard [] or willful or intentional misconduct") potentially apply to Plaintiffs' allegations.

The Legislature has also narrowly limited the definition of "improper personal benefit":

> A director is deemed not to have derived an improper personal benefit from any transaction if the transaction and the nature of any personal benefit derived by the director are not prohibited by state or federal law or regulation *and*, without further limitation . . . [t]he transaction is fair to the corporation at the time it is authorized, approved, or ratified as determined in accordance with s. 607.0832.

§ 607.0831(2)(b), FLA. STAT. (emphasis added).

As well, the jury is supposed to "assess a director's performance as of the time of the alleged act, omission, or failure of oversight. [The jury is] not to use the benefit of hindsight in evaluating a director's performance." ABA Model Jury Instr. Bus. Tort Lit. 342, No. 7.3.12.e. *See also Kloha v. Duda*, 246 F. Supp. 2d 1237, 1244 (M.D. Fla. 2003) (the business judgment rule "prevents a factfinder from using hindsight to second-guess directors' business decisions"). This is a critical consideration because much of the OCC-related evidence that Plaintiffs wish to introduce was written years after the underlying events.

A particularly egregious example is Plaintiffs' Exhibit P-538[6] – a June 5, 2020 letter to Gabina Rodriguez from the OCC proposing to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* June 5, 2020 Letter to G. Rodriguez, Ex. D (**filed under seal**). In that letter, the OCC expressly states that the proposed ▮▮▮▮ is based in part "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[6]  This was one of the letters provided to the Court on October 14, 2023.

███████████████." (emphasis added). But a "████████████████████████" is entirely irrelevant to whether Ms. Rodriguez exercised sound business judgment when the then-Directors approved the Banco de Venezuela correspondent relationship in 2016.

This same problem recurs in the July 29, 2020 letter (Plaintiffs' Exhibit P-553) advising Ms. Rodriguez of the OCC's decision to ████████████████. *See* July 29, 2020 Letter to G. Rodriguez, Ex. E (**filed under seal**). And both letters make the fundamental mistake of conflating Ms. Rodriguez's role as the interventor (i.e., receiver) of Corpofin with her duties as a Director. The July 29 letter, for example, ████████████████████████████████ ████████████████" based on facts that have nothing to do with her role as a Director, such as the fact that in 2009 ████████████████████████████████████████████ ████████████████████████████████."

The letter also darkly alleges that, during her tenure on the Board of Directors, Ms. Rodriguez "████████████████████████████████████████ ████████." But those individuals were nominated to the Board and unanimously supported by all shareholders (including Plaintiffs) *subject to approval by the OCC*. *See* 2015 Shareholder Ballot, attached as Exhibit F. And the *OCC approved them*. *See* OCC Letter to A. Colon dated July 7, 2015 (approving Ms. Yenny Gonzalez); OCC Letter to A. Colon dated Sept. 2, 2015 (approving Ms. Marcano-Belloso), Composite Ex. G (**filed under seal**).

Nothing in any of this correspondence indicates that the OCC was unaware in 2015 that Ms. Gonzalez and Ms. Marcano-Belloso were or had been employed by the Venezuelan government, least of all in any way that was problematic. The allegation that ████████████ ████████████████████ is worse than hindsight; it rewrites history.

10

Because relevance and probative value do not exist in a vacuum, Plaintiffs' argument that "[t]he business judgment rule has no bearing on whether evidence is admissible" should be rejected as absurd.

## III. THE COURT CANNOT APPLY A BLANKET HEARSAY EXCEPTION TO PLAINTIFFS' OCC-RELATED EXHIBITS

Again, Plaintiffs refer to "the OCC Documents" without specifying what documents they mean, as if the Court could enter a blanket ruling based on a couple of examples, one of which is entirely irrelevant: Plaintiffs address a July 29, 2020 letter to former Director Cesar Gomez. Mot. at 10. But Mr. Gomez was never served and thus never joined to the case. His conduct is therefore not before the Court.

The Directors do not disagree that some OCC documents fall within the hearsay exception for public records. But others do not. The OCC's July 25, 2019 letter to Ms. Rodriguez cited by Plaintiffs (Mot. at 9) is a case in point because it contains nothing but opinions and conclusory assertions, not findings of fact.

The Notes of Committee on the Judiciary, House Report No. 93-650 include the following comment regarding Rule 803(8): "The Committee intends that the phrase 'factual findings' be strictly construed and that evaluations or opinions contained in public reports shall not be admissible under this Rule." And while courts have not always strictly construed the rule to exclude legal or factual conclusions, the proper inquiry is to determine the trustworthiness of a document's assertions. *See Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 303-04 (11th Cir. 1989); *see also Crawford v. ITW Food Equip. Group, LLC*, 977 F.3d 1331, 1347 (11th Cir. 2020) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 n. 11 (1988)).

In *Hines*, the Eleventh Circuit considered the admissibility of an OSHA report under the Rule. It began by noting:

11

> The Advisory Comments to the rule set forth several considerations to aid in determining the trustworthiness of a public report: the timeliness of the investigation; the skill and experience of the investigator; whether the investigator held any sort of a hearing; and the investigator's impartiality. These considerations are not meant to be exhaustive.

886 F.2d at 303. The court also noted that "[a] district court might consider how the fact that no hearing was held in making the report affects its trustworthiness." *Id*.

As well, the court noted that "the OSHA investigator stands in a unique position because federal law generally prohibits him or her from testifying in private civil litigation." *Id*. "While the inability to cross-examine the investigator cannot per se invalidate the report since Rule 803(8) does not depend on the availability of the declarant, it is nonetheless a proper factor to take into consideration when deciding trustworthiness." *Id*. (citing *Wilson v. Attaway*, 757 F.2d 1227, 1245 (11th Cir. 1985)).

The July 2019 letter to Ms. Rodriguez touches on all of these concerns. First, the letter says nothing about an investigation or what evidence was evaluated, or when. It was also untimely, having been issued years after the events in question. It says nothing about having held a hearing. On its face, it asks for additional information, so it clearly was not a final evaluation or report.

Citing *Crawford*, Plaintiffs urge that "[a]dmission of public records can be justified by the probability that the officials conducting the investigation … will be careful and discriminating in selecting the factual data upon which to rely in reaching their findings and conclusions." Mot. at 11. But who conducted an "investigation" that gave rise to this letter?

The letter's author, Stephen A. Lybarger, is described on the OCC's website as one who:

> oversees the agency's licensing function in Washington, D.C., headquarters and its four district offices. He is responsible for licensing national banks and their activities and structure changes that support a safe and sound national banking system.

12

*See* https://www.occ.gov/about/who-we-are/leadership/bio-stephen-lybarger.html. No doubt he is eminently qualified for that role, but unlike the OSHA inspector in *Hines* there is no indication that he personally conducted an investigation from his office in Washington, D.C., or that he prepared a report of his findings based on an investigation. He does not say who made the allegations in the letter, what their foundation of knowledge was, or what was done to verify the allegations.

Moreover, the OCC has made it abundantly clear that it will not furnish a witness to testify about this letter or any other document to be offered by Plaintiffs. Mr. Lybarger has not been interviewed by anyone, let alone deposed or placed under an enforceable subpoena. In short, the jury cannot possibly be informed of what factors he considered when he authored this letter.

Given Mr. Lybarger's role in authoring the June 5 and July 29, 2020 letters described above, his comments in the July 2019 letter also smack of bias. By the summer of 2020, Mr. Lybarger had moved the goalposts by citing to a "███████████████████████████████ ███████████████████████████████. He also █████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████. As pointed out above, the notion that Ms. Rodriguez could have unilaterally "███████████████████████████" who were supported by Plaintiffs and approved by the OCC is a ridiculous exercise of hindsight.

Thus, the letters from the OCC to Ms. Rodriguez fail the requirements of Rule 803(8) and should be excluded as inadmissible hearsay.

The OCC's January 30, 2020 letter (Mot. at 9) is simply irrelevant. That letter addresses "███████████████████████████████" But Plaintiffs' Complaint contains no allegations related

13

to those items. Instead, Plaintiffs allege that "the RSU Plan and stock compensation scheme" was improper. Cmplt., *passem*. That is an entirely different matter.

The issues for trial are framed by the pleadings, and any issue not properly framed by the pleadings will be precluded from trial. *See Hallmark Specialty Ins. Co. v. Lion Heart Surgical Supply, LLC*, Case No. 20-cv-61483, 2021 U.S. Dist. LEXIS 196748, at *11-12 (S.D. Fla. Oct. 13, 2021) (Ruiz, II, D.J.). Thus, the OCC's January 30, 2020 letter to ENB should be excluded as irrelevant.

The letter is also inadmissible hearsay. It is merely routine supervisory correspondence that offers no factual findings in support of its conclusions and assertions. For example, the letter does not offer any sort of comparative analysis of ▮▮▮▮▮▮▮▮▮▮ on which to base its assertions.

## IV.  PLAINTIFFS FAIL TO SHOW WHY THE COURT SHOULD OVERRULE THE OCC's OBJECTION TO PLAINTIFFS' SUBPOENA

Plaintiffs claim to have served a subpoena on the OCC's Washington, D.C. office on September 26, 2023, more than two weeks before the previously-scheduled trial start date in October 16, 2023. The Court may wonder why Plaintiffs waited until now to raise this issue but, in any event, Plaintiffs fail to show why, at this 11th hour, the Court should indulge their request to overrule the OCC's objections to their subpoena.

It is of course well established that a party seeking evidence from a federal government agency must first seek that evidence via the agency's *Touhy* regulations. *See Hotel Employees-Hotel Assoc. Pension Fund v. Timperio*, 622 F. Supp. 606, 607-08 (S.D. Fla. 1985). The OCC's *Touhy* regulations are found at 12 CFR § 4.33, and include detailed requirements for what information a party to an adversarial matter must provide in a request for evidence, including witness testimony, from the OCC.

14

The Directors fulfilled the OCC's *Touhy* regulations to the letter in February 2023 when they asked the OCC to furnish a witness for deposition. The OCC rebuffed that request, making it clear that the agency has a strict policy of not getting involved in private litigation matters. Why should Plaintiffs be granted an exemption from *Touhy*? They offer no hint.

On the merits of their argument, Plaintiffs persist in conflating authenticity with admissibility. Even Plaintiffs acknowledge that the Directors have stipulated to authenticity of all OCC documents, without prejudice to any objection as to admissibility. Requiring the OCC to send an employee of this Court to authenticate records, the authenticity of which is not in dispute, clearly *would* be, as the OCC states in its objections, "a tremendous waste of public resources."

Finally, Plaintiffs' claim that "the OCC [] already decided to participate in this litigation [] when it intervened to assert privilege over the OCC Documents" is ludicrous. As the holder of the privilege, Plaintiffs' conduct left the OCC with no choice but to intervene. Their Motion must be denied.

## **CONCLUSION**

The Directors respectfully request that the Court deny Plaintiffs' Motion to Overrule Objections to Admissibility of OCC Documents [DE 470].

Dated: May 28, 2024.                    **DIAZ REUS & TARG, LLP**

100 Southeast Second Street
3400 Miami Tower
Miami, Florida 33131
Telephone: (305) 375-9220

By: /s/ *Brant C. Hadaway*
Evan J. Stroman, Esq., CPA (Florida Bar No. 118929)
Attorney E-mail Address: estroman@diazreus.com
Brant C. Hadaway, B.C.S. (Florida Bar No. 494690
Attorney E-mail Address: bhadaway@diazreus.com
Ibrahim Amir (Florida Bar No. 1005664)
Attorney E-mail Address: iamir@diazreus.com

*Counsel for the Directors*