UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-20201-DPG

BANCOR GROUP, INC., and STITCHING
PARTICULIER FONDS FRANEKER,
derivatively on behalf of
EASTERN NATIONAL BANK, N.A.,

      Plaintiffs,

v.

GABINA RODRIGUEZ, LOUIS FERREIRA,
CESAR A. GOMEZ VALERO, KEITH PARKER,
CARLOS RODRIGUEZ, and GUSTAVO MACIAS

      Defendants.

_____/

**PLAINTIFFS' MOTION**
**FOR JUDGMENT AS A MATTER OF LAW**

      Plaintiffs Bancor Group Inc. ("Bancor") and Stitching Particulier Fonds Franeker ("Franeker") (collectively, the "Minority Shareholders"), derivatively on behalf of Eastern National Bank, N.A. ("ENB" or the "Bank") (collectively, "Plaintiffs"), submit this Motion after the close of all the evidence and before the case is submitted to the jury and respectfully request the Court enter judgment as a matter of law on Plaintiffs' causes of action against Gabina Rodriguez, Carlos Rodriguez, Louis Ferreira, Keith Parker, and Gustavo Macias (collectively, "Defendants"), as well as on each of Defendants' defenses.

**I.     BACKGROUND**

      Plaintiffs are pursuing the following ten causes of action against the following Defendants:

      1.     Breach of fiduciary duty of care against Gabina Rodriguez;

1

2.      Breach of fiduciary duty of loyalty and good faith against Gabina Rodriguez;

3.      Breach of fiduciary duty of care against Carlos Rodriguez;

4.      Breach of fiduciary duty of loyalty and good faith against Carlos Rodriguez;

5.      Breach of fiduciary duty of care against Louis Ferreira;

6.      Breach of fiduciary duty of loyalty and good faith against Louis Ferreira;

7.      Breach of fiduciary duty of care against Keith Parker;

8.      Breach of fiduciary duty of loyalty and good faith against Keith Parker;

9.      Breach of fiduciary duty of care against Gustavo Macias; and

10.      Breach of fiduciary duty of loyalty and good faith against Gustavo Macias.

## II.    ARGUMENT

### A.    LEGAL STANDARD

Courts can grant a motion for judgment as a matter of law "when the evidence is overwhelmingly in favor of one party's position." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130 (11th Cir. 2018). A motion for judgment a matter of law can be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party." *Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1320 (11th Cir. 2016) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)) (internal quotations omitted). In making this determination, a court "must draw all inferences in favor the nonmoving party" and is prohibited from making "credibility determinations" or "weigh[ing] the evidence." *Reeves*, 530 U.S. at 150. Where the evidence is "uncontradicted and unimpeached" or where the only legally sufficient evidence in the record supports the movant, entry of judgment as a matter of law in the movant's favor is appropriate—as is the case here. *Id.* at 151.

### B.        BREACH OF FIDUCIARY DUTY OF CARE

Plaintiffs have put forward ample evidence—far greater than what is legally sufficient—showing that each of the Defendants breached their fiduciary duty of care owed to ENB. The evidence so overwhelmingly favors Plaintiffs that a reasonable jury properly instructed could only find for Plaintiffs.

Florida law imposes a "fiduciary duty of care" upon corporate officers and directors. *In re Aqua Clear Techs., Inc.*, 361 B.R. 567, 575 (Bankr. S.D. Fla. 2007). "The duty of care is the requirement to use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions[.]" *Taubenfeld v. Lasko*, 324 So. 3d 529, 538 (Fla. Dist. Ct. App. 2021) (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005)).[1]

There are three elements to a breach of a fiduciary duty of care claim: (1) "the existence of a fiduciary duty"; (2) a "breach of that duty"; and (3) the breach being "the proximate cause of the plaintiff's damages." *Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983, 989 (11th Cir. 2020) (quoting *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)). As to the first element—the existence of a fiduciary duty—the parties have already stipulated that "Defendants owed fiduciary duties to ENB and its shareholders while serving on the ENB Board of Directors." Dkt. 345 at 13. As such, Plaintiffs only had to prove the second and third elements at trial. *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 677-78 (2010) (holding that "factual stipulations are formal concessions ... that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact"). A breach

---

[1] "Florida courts may look to the law of Delaware for guidance in establishing their own corporate doctrines." *Taubenfeld*, 324 So. 3d at 538 n.1.

of fiduciary duty can exist if the Defendants' conduct was grossly negligent or intentional. *Taubenfeld*, 324 So. 3d at 538; *Palafrugell Holdings, Inc. v. Cassel*, 825 So. 2d 937, 939 n.1 (Fla. Dist. Ct. App. 2001), *opinion corrected*, 854 So. 2d 225 (Fla. Dist. Ct. App. 2003).

### 1.     Breach of Fiduciary Duty of Care Against Gabina Rodriguez

There are two elements in dispute. The first is whether the Defendant Gabina Rodriguez breached her fiduciary duty of care that she owed to the Bank. The second is whether Ms. Rodriguez's breach was the proximate cause of damage to the Bank. *Gracey*, 837 So. 2d at 353. As to the first element, there is an abundance of evidence that Ms. Rodriguez breached her fiduciary duty of care to the Bank. There is evidence in the record, for example, that Ms. Rodriguez decided to open a correspondent account for Banco de Venezuela despite strong warnings from the Bank's compliance officer that doing so "posed enormous BSA/AML OFAC risk for the bank." June 11 Trial Tr. 91:04-91:16. According to the Office of the Comptroller of the Currency ("OCC"), ███████████████████████████████████████████. P-553. The compliance officer, Jack Lantz, testified that he specifically met with Ms. Rodriguez to warn her of this risk. *Id.* He memorialized his objections in writing and warned of the likelihood that Bank would face a consent order if the Defendants chose to establish this relationship with Banco de Venezuela. P-041. Mr. Lantz testified that it was a "terrible thing" to be under a consent order. June 11 Trial Tr. Tr. 111:12-13. Mr. Lantz also testified that it was unlikely any other bank in the United States would open an account for Banco de Venezuela. June 11 Trial Tr. 96:09-96:17. Ms. Rodriguez made clear during her testimony that she was aware of the risks at the time and chose to pursue the relationship anyway. June 10 Trial Tr. 65:09-68:22; P-041. According to the OCC, ███████████████████████████████████████████████. P-553. The OCC found t██████████████████████████████████████████████████████

███████████, P-296, and the Bank was issued the 2018 Consent Order, just as Mr. Lantz predicted. P-222. A person exercising due care would not expose the Bank to this level of risk. It is clear, based on the evidence that Plaintiffs have presented, that Ms. Rodriguez was well aware of these dangers and "pushed" for the Banco de Venezuela relationship regardless.

Ms. Rodriguez exposed the Bank to even more risk by deciding, with Mr. Rodriguez, Mr. Parker, and Mr. Macias, to disable alerts for transactions involving "politically exposed persons." June 10 Trial Tr. 71:03-74:03. A "politically exposed person" is a designation by the Financial Action Task Force on Money Laundering ("FATF") to identify those individuals "entrusted with a prominent function." *FATF Guidance: Politically Exposed Persons (Recommendations 12 and 22)*, FATF, https://www.fatf-gafi.org/en/publications/Fatfrecommendations/Peps-r12-r22.html (last visited June 24, 2024). According to FATF, "[m]any PEPs hold positions that can be abused for the purpose of laundering illicit funds or other predicate offences such as corruption or bribery." *Id.* Opening and maintaining the Banco de Venezuela correspondent account exposed the Bank to "enormous" risk, in part, because of sanctions against the Government of Venezuela. *See* Exec. Order No. 13,692, 80 FR 12747 (Mar. 8, 2015) (imposing sanctions, in part, because of the "exacerbating presence of significant public corruption" in Venezuela). Plaintiffs' expert Wayne Crowell testified that the Banco de Venezuela correspondent account posed risk to the Bank because of "significant corruption in Venezuela." June 18 Trial Tr. 21:12-22:01. According to Mr. Crowell, Venezuela is "considered a high risk country for any money laundering issues" and a bank needs to have "outstanding controls" in order to maintain this type of account, especially because the correspondent relationship involved "third-party payments [by] people who [were] not customers of Eastern National Bank." *Id.* Deactivating one of the Bank's tools to prevent money

laundering and the violation of U.S. sanctions exposed the Bank to such a high degree of risk that it cannot be found that a reasonable person in that situation would do the same.

As to the second element still in dispute, Plaintiffs have put forward overwhelming evidence that Ms. Rodriguez's breach of the fiduciary duty of care was the proximate cause of damages to the Bank. Plaintiffs have proved causation with evidence that the damage to the Bank is directly attributable to Ms. Rodriguez's breach of the duty of care. Mr. Macias testified that "[t]he Board is ultimately responsible for everything that happens to a bank." June 25 Trial Tr. 160:19-161:01. Defendants' expert, Mr. Robert Aldir, testified to the same effect: "the buck stops" with the directors for everything that happens at the Bank. June 25 Trial Tr. 320:04-09. This would of course include Ms. Rodriguez. Defendant Carlos Rodriguez testified that the Bank's "BSA extraordinary expenses" in 2018 were those expenses that "the bank incurred by having to deal with the 2018 consent order." June 14 Trial Tr. 97:24-98:02; P-298. Mr. Rodriguez testified that the Bank had to spend $1.822 million on "BSA extraordinary expenses in 2018, $2.4 million in 2019, $1,937,499 in 2020, and $451,458 in 2021. June 14 Trial Tr. 103:01-107:12; P-004; P-005; P-006. Mr. Crowell testified that, in his expert opinion, Defendants were "responsible for the substantial losses" to the Bank totaling up to $27.204 million. June 18 Trial Tr. 14:12-14:17. Ms. Rodriguez also testified that the Bank has been losing money since 2018. June 10 Trial Tr. 110:18-111:25.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Ms. Rodriguez on Plaintiffs' breach of fiduciary duty of care claim. Judgment as a matter of law is therefore appropriate.

### 2. Breach of Fiduciary Duty of Care Against Carlos Rodriguez

Plaintiffs needed to prove that Defendant Carlos Rodriguez: (1) breached his fiduciary duty of care; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. As to the first disputed element, Plaintiffs have put forward overwhelming evidence that Mr. Rodriguez breached his fiduciary duty of care. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

P-296. Along with Ms. Rodriguez, Mr. Rodriguez approved the opening of the Banco de Venezuela correspondent account and approved the disabling of alerts for "politically exposed persons." June 10 Trial Tr. 71:03-74:03; June 11 Trial Tr. 151:12-151:19. In addition, Mr. Rodriguez testified that he voted to appoint Cesar Gomez Valero to ENB's Board without any knowledge of whether Mr. Gomez Valero had any U.S. banking experience. June 14 Trial Tr. 11:10-11:22. By engaging in these actions, Mr. Rodriguez exposed the Bank to enormous risks despite warnings from BSA officer Jack Lantz, which was inconsistent with the requirements of a director exercising due care and resulted in OCC enforcement action, as described in Section II.B.1 above.

As to the second element still in dispute, Plaintiffs have put forward overwhelming evidence that Mr. Rodriguez's breach of the fiduciary duty of care was the proximate cause of

---

[2] The OCC uses CAMEL ratings—the "uniform interagency rating systems adopted by the FFEIC to assign banks ratings." These ratings are used to document a bank's "condition and resilience." OFFICE OF THE COMPTROLLER OF THE CURRENCY, COMPTROLLER'S HANDBOOK: BANK SUPERVISION PROCESS 28 (2019), *available at* https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/bank-supervision-process/pub-ch-bank-supervision-process.pdf.

damages to the Bank. Plaintiffs have proved causation with evidence that the damage to the Bank is directly attributable to Mr. Rodriguez's breach of the duty of care. Mr. Macias testified that "[t]he Board is ultimately responsible for everything that happens to a bank." June 25 Trial Tr. 160:19-161:01. Defendants' expert, Mr. Robert Aldir, testified to the same effect: "the buck stops" with the directors for everything that happens at the Bank. June 25 Trial Tr. 320:04-09. This would of course include Mr. Rodriguez as well. Mr. Rodriguez testified that the Bank's "BSA extraordinary expenses" in 2018 were those expenses that "the bank incurred by having to deal with the 2018 consent order." June 14 Trial Tr. 97:24-98:02; P-298. Mr. Rodriguez testified that the Bank had to spend $1.822 million on "BSA extraordinary expenses in 2018, $2.4 million in 2019, $1,937,499 in 2020, and $451,458 in 2021. June 14 Trial Tr. 103:01-107:12; P-004; P-005; P-006. Mr. Crowell testified that, in his expert opinion, Defendants were "responsible for the substantial losses" to the Bank totaling up to $27.204 million. June 18 Trial Tr. 14:12-14:17. Ms. Rodriguez also testified that the Bank has been losing money since 2018. June 10 Trial Tr. 110:18-111:25.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Mr. Rodriguez on Plaintiffs' breach of fiduciary duty of care claim. Judgment as a matter of law is therefore appropriate.

### 3.     Breach of Fiduciary Duty of Care Against Louis Ferreira

Plaintiffs needed to prove that Defendant Louis Ferreira: (1) breached his fiduciary duty of care; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. As to the first element, the Bank's articles of association and bylaws require the Board to call a shareholder meeting annually. P-012, § 4. However, Juan B. Santaella testified that Mr. Ferreira and the Bank's other directors did not hold an annual shareholder meeting in 2020 and have not

held a meeting since 2021.[3] June 11 Trial Tr. 179:02-180:01. Mr. Ferreira also testified that there

has been only one shareholder meeting since he joined the Board of the Bank. June 17 Trial Tr.

78:13-78:25. In addition, Mr. Ferreira became the President of ENB in March 2020. June 17 Trial

Tr. 109:01-109:05. He also became CEO and Board Chair shortly thereafter. June 17 Trial Tr.

109:06-109:13. In November 2020, during Mr. Ferreira's tenure, the Bank was forced to enter into

a second Consent Order with the OCC, wherein the OCC found that the Bank had failed to comply

with the prior 2018 Consent Order and found that ███████████████████████████████

████████████. P-583. There is no evidence that Mr. Ferreira, having served on the Board for over

a year before the 2020 Consent Order was issued, took any action to lower the directors'

compensation to a reasonable and supportable number—especially given the Bank's limited

capital and troubled financial state. █████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████. P-527. Even still, ███████████████████████████

███████████████████████████████. *Id.* Similarly, Mr. Santaella testified that

the 2020 Consent Order happened on Mr. Ferreira's watch. June 11 Trial Tr. 175:07-175:10.

According to Mr. Santaella, the 2020 Consent Order was caused by "unsafe [and] unsound banking

practices[,]" and because the "board and management had not corrected and achieved compliance

with the previous consent order." June 11 Trial Tr. 172:08-174:15. Mr. Santaella continued that

the directors, including Mr. Ferreira, "had not provided strategic direction" to the Bank, "ha[d] not

adopted a comprehensive corporate governance[,]" and "ha[d] not ensured compliance with

BSA[.]" *Id.* In addition, Mr. Crowell testified that, in his expert opinion, Defendants "lacked

---

[3] The Bank also did not hold an annual shareholder meeting in 2019, per Mr. Santaella's testimony.
Mr. Ferreira joined the Board of ENB in October 2019. June 17 Trial Tr. 58:04-58:06.

experience" and "failed to carry out their responsibilities to provide oversight to the bank." June 18 Trial Tr. 13:23-14:03.

As to the second element, Plaintiffs have proved that damage suffered by the Bank is directly attributable to Mr. Ferreira's breach of the duty of care. As Mr. Macias testified, "[t]he Board is ultimately responsible for everything that happens to a bank." June 25 Trial Tr. 160:19-161:01. Defendants' expert, Mr. Robert Aldir, testified to the same effect: "the buck stops" with the directors for everything that happens at the Bank. June 25 Trial Tr. 320:04-09. Mr. Ferreira is responsible for the Bank's management from the time he joined the Board in October 2019. This includes the excessive compensation and fees that the directors received throughout 2020, the entirety of which Mr. Ferreira served as a board member. Mr. Crowell testified that, in his expert opinion, Mr. Ferreira was responsible for taking no action to control this excessive cost, which caused the Bank to be damaged by $236,637 in excessive directors' compensation and fees for the year of 2020. June 18 Trial Tr. 106:23-108:11.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Mr. Ferreira on Plaintiffs' breach of fiduciary duty of care claim. Judgment as a matter of law is therefore appropriate.

### 4. Breach of Fiduciary Duty of Care Against Keith Parker

Plaintiffs needed to prove that Defendant Keith Parker: (1) breached her fiduciary duty of care; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. Throughout this trial, Plaintiffs have put forward significant evidence that Mr. Parker breached his fiduciary duty of care that he owed the Bank. Mr. Santaella testified that Mr. Parker, along with Ms. Rodriguez, Mr. Rodriguez, and Mr. Macias, approved the opening of the Banco de Venezuela correspondent account. June 11 Trial Tr. 151:12-151:19. Ms. Rodriguez testified that

she, Mr. Parker, and Mr. Macias decided to disable alerts for transactions involving "politically exposed persons." June 10 Trial Tr. 71:03-74:03. These decisions by Mr. Parker exposed the Bank to tremendous risk for the reasons outlined in Section II.B.1 above.

In addition, ███████████████████████████████████████████████ ████████████████████████████" P-296. ██████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████" *Id.* The Bank has been forced to enter into two consent orders within two years, both of which required major improvements to the Bank's operations and management. P-222; P-583. Mr. Santaella testified that the 2020 Consent Order was caused by "unsafe [and] unsound banking practices[]" because the "board and management had not corrected and achieved compliance with the previous consent order." June 11 Trial Tr. 172:08-174:15.

As to the second disputed element, Plaintiffs have put forward overwhelming evidence that Mr. Parker's breaches were the proximate cause of the Bank's damages. For example, Mr. Ferreira testified that the Bank has lost about $3 to $4 million in non-Venezuelan correspondent accounts because of the 2018 Consent Order. June 17 Trial Tr. 66:01-68:04. The Bank was forced to enter into the 2018 Consent Order in part because of the Board's failure to ensure that the Bank had proper BSA/AML safeguards in place. June 17 Trial Tr. 68:07-68:11. ████████████████████████████

███████████████████████████████████████████████████████ P-296. Mr. Rodriguez testified that the Bank's "BSA extraordinary expenses" in 2018 were those expenses that "the bank incurred by having to deal with the 2018 consent order." June 14 Trial Tr. 97:24-98:02; P-298. Mr. Rodriguez testified that the Bank had to spend $1.822 million on "BSA extraordinary expenses in 2018, $2.4 million in 2019, $1,937,499 in 2020, and $451,458 in 2021. June 14 Trial Tr. 103:01-

107:12; P-004; P-005; P-006. In addition, Ms. Rodriguez testified that the Bank has been losing money every year beginning in 2018. June 10 Trial Tr. 110:18-111:25. Overall, Mr. Crowell testified that Defendants were "responsible for the substantial losses" to the Bank totaling up to $27.204 million. June 18 Trial Tr. 14:12-14:17.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Mr. Parker on Plaintiffs' breach of fiduciary duty of care claim. Judgment as a matter of law is therefore appropriate.

### 5.   Breach of Fiduciary Duty of Care Against Gustavo Macias

Plaintiffs needed to prove that Defendant Gustavo Macias: (1) breached his fiduciary duty of care; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. Throughout this trial, Plaintiffs have put forward significant evidence that Mr. Macias breached his fiduciary duty of care that he owed the Bank. Mr. Santaella testified that Mr. Macias, along with Ms. Rodriguez, Mr. Rodriguez, and Mr. Parker, approved the opening of the Banco de Venezuela correspondent account. June 11 Trial Tr. 151:12-151:19; Dkt. 345 at 11 (Stipulated Fact 20). Ms. Rodriguez testified that she, Mr. Macias, and Mr. Parker decided to disable alerts for transactions involving "politically exposed persons." June 10 Trial Tr. 71:03-74:03. These decisions by Mr. Macias exposed the Bank to tremendous risk and consequences, as outlined in Section II.B.1 above.

In addition, ███████████████████████████████████████████████

████████████." P-296. The Bank has been forced to enter into two consent orders within two years, both of which required major improvements to the Bank's management. P-222; P-583. Mr. Santaella testified that the 2020 Consent Order was caused by "unsafe [and] unsound banking

practices[]" because the "board and management had not corrected and achieved compliance with the previous consent order." June 11 Trial Tr. 172:08-174:15.

As to the second disputed element, Plaintiffs have put forward clear evidence that the Bank's damages were proximately caused by Mr. Macias' breaches. As explained above, the Bank has lost $3 to $4 million in non-Venezuelan correspondent account business because of Mr. Macias' actions, ████████████████████████████████████. P-296; June 17 Trial Tr. 66:01-68:11. Mr. Rodriguez testified that the Bank's "BSA extraordinary expenses" in 2018 were those expenses that "the bank incurred by having to deal with the 2018 consent order." June 14 Trial Tr. 97:24-98:02; P-298. Mr. Rodriguez testified that the Bank had to spend $1.822 million on "BSA extraordinary expenses in 2018, $2.4 million in 2019, $1,937,499 in 2020, and $451,458 in 2021. June 14 Trial Tr. 103:01-107:12; P-004; P-005; P-006. In addition, Ms. Rodriguez testified that the Bank has been losing money every year beginning in 2018. June 10 Trial Tr. 110:18-111:25. Overall, Mr. Crowell testified that Defendants, including Mr. Macias were "responsible for the substantial losses" to the Bank totaling up to $27.204 million. June 18 Trial Tr. 14:12-14:17.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Mr. Macias on Plaintiffs' breach of fiduciary duty of care claim. Judgment as a matter of law is therefore appropriate.

## C.   BREACH OF FIDUCIARY DUTY OF LOYALTY AND GOOD FAITH

Plaintiffs have also proven at trial that each of the Defendants breached their fiduciary duty of loyalty and good faith owed to ENB. The evidence so overwhelmingly favors Plaintiffs on these claims that a reasonable jury properly instructed could only find for Plaintiffs.

The duty of loyalty imposed on corporate officers and directors "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Taubenfeld*, 324 So. 3d at 538 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). "The duty to act in good faith is a subsidiary element of the duty of loyalty." *Id.*

There are three elements to a breach of a fiduciary duty of loyalty and good faith claim: (1) "the existence of a fiduciary duty"; (2) a "breach of that duty"; and (3) the breach being "the proximate cause of the plaintiff's damages." *Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983, 989 (11th Cir. 2020) (quoting *Gracey*, 837 So. 2d at 353). The parties have already stipulated to the first element: that "Defendants owed fiduciary duties to ENB and its shareholders while serving on the ENB Board of Directors." Dkt. 345 at 13. As such, Plaintiffs only had to prove the second and third elements at trial. *Christian Legal Soc.*, 561 U.S. at 677-78. A breach of fiduciary duty can exist if the Defendants' conduct was grossly negligent or intentional. *Taubenfeld*, 324 So. 3d at 538; *Palafrugell*, 825 So. 2d at 939 n.1.

### 1.    Breach of Fiduciary Duty of Loyalty and Good Faith Against Gabina Rodriguez

Plaintiffs needed to prove that Ms. Rodriguez: (1) breached her fiduciary duty of loyalty and good faith; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. As to the first element in dispute, Plaintiffs have put forward more than enough evidence to prove that Ms. Rodriguez breached her fiduciary duty of loyalty that she owed to ENB. The decision to open the Banco de Venezuela account, described in Section II.B.1 above, is evidence of Ms. Rodriguez took action at the Bank to advance the interests of the regime in Venezuela at the expense of the Bank. At a time when no other bank in the United States appeared willing to open a correspondent account for Banco de Venezuela, according to the testimony of

Mr. Lantz, Ms. Rodriguez and the other directors of ENB decided to take on this enormous risk. June 11 Trial Tr. 91:04-91:16; P-041. The only legitimate explanation is that Ms. Rodriguez was putting the interests of the Venezuelan Government ahead of the interests of the Bank. There is further evidence that Ms. Rodriguez breached her duty of loyalty by advancing the interests of the Venezuelan Government. Ms. Rodriguez testified that she appointed officials of the Venezuelan Government, including Mayela Marcano, Yenny Gonzalez, and Defendant Cesar Gomez Valero, to the Board of ENB. June 10 Trial Tr. 51:10-53:03; P-032; P-533. Mr. Rodriguez testified that Mr. Gomez Valero was the second highest ranking official of SUDEBAN in Venezuela. June 14 Trial Tr. 10:02-10:24. Plaintiffs also put forward evidence that, in July 2020, ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ " *Id.*; June 10 Trial Tr. 165:15-166:11. Mr. Crowell's testimony that Defendants "lacked independence" is further evidence that Ms. Rodriguez was not acting in the best interest of the Bank. June 18 Trial Tr. 13:25-14:02.

In addition, Plaintiffs also put forward evidence that Ms. Rodriguez breached her fiduciary duty of loyalty by awarding herself excessive compensation. In December 2018, just two months after entering into a consent order with the OCC, Ms. Rodriguez and the other Directors of ENB decided to reward themselves an equity incentive plan to provide for the issuance of restricted stock units (the "RSU Plan"). P-253. Although the RSU Plan appears on its face to be an agreement

---

[4] By law, every director of a national bank in the United States must be a U.S. citizen, unless the Comptroller waives the requirement. 12 U.S.C. § 72.

between the Bank's directors and the Bank's majority shareholders, Ms. Rodriguez signed on both sides of the transaction—in her capacity as a director and as representative of Mercorp, N.V., the bank's majority shareholder. *Id.* According to the Mr. Crowell's testimony, the RSU Plan committed the Bank to give "the equivalent of 13 percent of the shares of the bank" to the directors—"a very significant number for any bank, much less for Eastern National Bank." June 18 Trial Tr. 53:01-53:16. Mr. Crowell further testified that the decision by Ms. Rodriguez and the other directors amounted to a conflict of interest, and a truly independent director would have recognized that and not voted for the plan. June 18 Trial Tr. 54:23-55:06.

Ms. Rodriguez's decision to award herself excessive compensation did not stop at the RSU Plan. According to the testimony of Mr. Santaella, Ms. Rodriguez's compensation (and the compensation for the Bank's directors generally) was "three and a half times higher than the average for a bank of [ENB's] size." June 11 Trial Tr. 174:05-174:15. During her tenure at the Bank, Ms. Rodriguez received per diems from both ENB and from Mercorp for effectively the same work. P-583. According to her testimony, Ms. Rodriguez would receive, in any given month, $6,000 from ENB an $3,500 from Mercorp, plus per diem when she traveled. June 10 Trial Tr. 158:04-158:11. In addition, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

P-484. One of the requirements of the Bank's 2020 Consent Order with the OCC was that Ms. Rodriguez and the other directors:

> develop and submit for a prior written determination of no supervisory objection, an acceptable written program that includes policies, procedures, systems, and controls designed to ensure the Bank's Board and executive officer salaries, fees, benefits, other compensation, and travel-related costs are market-based, reasonable, and proportionate to the services rendered; take into account the Bank's earnings and capital levels; and are supported by adequate documentation in the books and records of the Bank[.]

P-583. Ms. Rodriguez and the other directors were repeatedly warned about their excessive compensation. Mr. Santaella testified about these warnings. June 11 Trial Tr. 174:05-174:15. Nevertheless, Ms. Rodriguez and the other directors decided to reward themselves by approving the RSU Plan.

As to the second element in dispute, Mr. Crowell testified that the breaches by Ms. Rodriguez and her fellow directors have cost the Bank up to $27.204 million. June 18 Trial Tr. 14:12-14:17. With respect to Ms. Rodriguez's bias, Plaintiffs have put forward evidence of the "extraordinary BSA expenses" that the Bank has had to incur as a direct result of the decision by Ms. Rodriguez to push the Bank to open the Banco de Venezuela correspondent account. June 14 Trial Tr. 97:24-98:02; 103:01-107:12; P-004; P-005; P-006; P-298. ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████ P-553. The RSU Plan and Ms. Rodriguez's other forms of excessive compensation have also cost the Bank significantly, according to the significant evidence that Plaintiffs have presented. Ms. Rodriguez testified that under the RSU Plan, the Bank is required to issue herself and the other beneficiaries 30,000 stock units worth $16 per share, for a total of $576,000 each. June 10 Trial Tr. 126:19-171:18. According to Mr. Crowell, the RSU Plan "would have affected [the Bank's] earnings which would have affected capital[.]" June 18 Trial Tr. 54:17-54:20. The evidence presented at trial has overwhelmingly demonstrated that Ms. Rodriguez breached her fiduciary duty of loyalty and good faith to the Bank, and that this breach was the proximate cause of damage to the Bank.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Ms. Rodriguez on Plaintiffs' breach of fiduciary duty of loyalty and good faith claim. Judgment as a matter of law is therefore appropriate.

> 2.   **Breach of Fiduciary Duty of Loyalty and Good Faith Against Carlos Rodriguez**

Plaintiffs needed to prove that Defendant Carlos Rodriguez: (1) breached his fiduciary duty of loyalty and good faith; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. Plaintiffs have presented overwhelming evidence that Mr. Rodriguez breached his duty of loyalty and good faith to the Bank. Mr. Rodriguez testified that he requested, and the Board ultimately approved a significant raise to his salary as the Bank's President. He requested a salary increase from $250,000 to $400,000 because this was "the amount that [he] was willing to accept to lead the bank that was heading to an iceberg." June 14 Trial Tr. 50:10-53:21; P-356. The "iceberg" to which Mr. Rodriguez referred was the 2018 Consent Order with the OCC. June 14 Trial Tr. 54:01-54:03. As Mr. Rodriguez testified, he requested and the Board approved a $150,000 raise within months of the 2018 Consent Order, ████████████████████████████ ████████████████████████████████ the approval of the RSU Plan, and the decision by Mr. Rodriguez and the other directors to lay off several employees of the Bank. June 14 Trial Tr. 54:01-55:11.

In addition, Plaintiffs put forward evidence that Mr. Rodriguez breached his fiduciary duty of loyalty and good faith by pushing the Bank to open a credit relationship with Michael Coira, with whom he has a social relationship, even though Mr. Rodriguez claims to have recused himself from the decision. P-368; P-369; P-370. According to Mr. Rodriguez's testimony, Mr. Coira committed a "massive fraud" on the Bank, and the Bank lost $4 million [as a] result of that fraud." June 14 Trial Tr. 77:13-77:19. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ P-296. ███ ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ By taking these actions, Mr. Rodriguez put his personal interests about the interests of the Bank.

As to the second disputed element, Mr. Rodriguez testified that the loan relationship with Mr. Coira, which Mr. Rodriguez recommended, cost the Bank $4 million. June 14 Trial Tr. 77:13-77:19. Ms. Rodriguez also testified that the Bank lost $4 million because on a bad loan to Mr. Coira. June 12 Trial Tr. 5:18-6:5. According to Ms. Rodriguez's testimony, the RSU Plan will ultimately require the Bank to issue shares worth $576,000 to Mr. Rodriguez and the other beneficiaries. June 10 Trial Tr. 126:19-171:18. In total, Mr. Crowell testified that the breaches by Mr. Rodriguez and his fellow directors have cost the Bank up to $27.204 million. June 18 Trial Tr. 14:12-14:17. There is overwhelming evidence that Mr. Rodriguez breached his fiduciary duty of loyalty and good faith to ENB, and that the breach was the proximate cause of ENB's damages.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Mr. Rodriguez on Plaintiffs' breach of fiduciary duty of loyalty and good faith claim. Judgment as a matter of law is therefore appropriate.

3.      **Breach of Fiduciary Duty of Loyalty and Good Faith Against Louis Ferreira**

Plaintiffs needed to prove that Defendant Louis Ferreira: (1) breached his fiduciary duty of loyalty and good faith; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. As to the first disputed element, Mr. Ferreira has made decisions demonstrating his personal loyalty to Ms. Rodriguez at the expense of the Bank. ████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████. June 11 Trial Tr. 53:05-53:10. As Ms. Rodriguez testified, the Bank was paying for these extraordinary costs while the Bank was "suffering millions of dollars in losses[.]" *Id.* ████████████████████████

███████████████████████████████████████████████

████████████████████████████ P-553. As Mr. Crowell testified, the Defendants "lacked independence[.]" June 18 Trial Tr. 13:25-14:02. Mr. Ferreira demonstrated that lack of independence by choosing to spend potentially millions of dollars of the Bank's resources out of personal loyalty to Ms. Rodriguez, not because he was acting in the best interest of the Bank. *See* June 11 Trial Tr. 53:19-53:22. ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ *See* June 11 Trial Tr. 54:14-55:04.

In addition, Mr. Ferreira decided to lay off several Bank employees, including the kitchen cook, two branch managers, the accounts payable clerk, a customer service representative, and an HR benefits coordinator. P-509. Mr. Ferreira testified that these lay-offs as necessary "cost cutting" measures. June 17 Trial Tr. 113:06-113:07. Meanwhile, ████████████████████ ████████████████████████████. P-484; June 10 Trial Tr. 144:07-144:11; June 17 Trial Tr. 112:03-112:08.  An outside consultant, ██████████████

███████████████████████████████████████████████

██████████████████████████ P-527. ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ *Id.* Mr. Ferreira

made these comments despite the fact that ████████████████████████████████████ ████████████████████████████. P-583; June 11 Trial Tr. 173:23-174:15.

As to the second element, Plaintiffs have proved that damage suffered by the Bank is directly attributable to Mr. Ferreira's breach of the duty of loyalty and good faith. As Mr. Macias testified, "[t]he Board is ultimately responsible for everything that happens to a bank." June 25 Trial Tr. 160:19-161:01. Defendants' expert, Mr. Robert Aldir, testified to the same effect: "the buck stops" with the directors for everything that happens at the Bank. June 25 Trial Tr. 320:04-09. Mr. Ferreira is responsible for the Bank's management from the time he joined the Board in October 2019. This includes the excessive compensation and fees that the directors received throughout 2020, the entirety of which Mr. Ferreira served as a board member. Mr. Crowell testified that, in his expert opinion, Mr. Ferreira was responsible for taking no action to control this excessive cost, which caused the Bank to be damaged by $236,637 in excessive directors' compensation and fees for the year of 2020. June 18 Trial Tr. 106-108.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Mr. Ferreira on Plaintiffs' breach of fiduciary duty of loyalty and good faith claim. Judgment as a matter of law is therefore appropriate.

**4. Breach of Fiduciary Duty of Loyalty and Good Faith Against Keith Parker**

Plaintiffs needed to prove that Mr. Parker: (1) breached his fiduciary duty of loyalty and good faith; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. As to the first contested element, Plaintiffs have put forward clear and overwhelming proof that Mr. Parker breached his fiduciary duty of loyalty and good faith. Mr. Crowell testified that Defendants, including Mr. Parker, "lacked independence" in carrying out their responsibilities

as directors of ENB. June 18 Trial Tr. 13:25-14:02. As a result, Mr. Parker approved the Banco de Venezuela account that Ms. Rodriguez pushed. P-553. Mr. Parker is responsible for the decision to approve the RSU Plan—i.e., to reward himself and his fellow directors at a time when the Bank is losing millions of dollars every year. P-253. Mr. Parker made this decision just two months after the OCC and ENB entered into a Consent Order. *Id.* In addition, Mr. Parker and his fellow directors approved this plan without informing the Bank's minority shareholders (including Plaintiffs), according to the testimony of Mr. Rodriguez. June 14 Trial Tr. 41:08-41:12. ███████████████

███████████████████████████████████████████████████████

██████████████ P-459. As Mr. Crowell stated, Mr. Parker and the other Defendants "paid themselves excessive compensation that basically was a conflict of interest[.]" June 18 Trial Tr. 14:07-14:10. According to Mr. Crowell, Mr. Parker "put [his] personal interest ahead of the interest of Eastern National Bank." *Id.*

As to the second element, Plaintiffs have proved that damage suffered by the Bank is directly attributable to Mr. Parker's breach of the duty of loyalty and good faith. As Mr. Macias testified, "[t]he Board is ultimately responsible for everything that happens to a bank." June 25 Trial Tr.160:19-161:01; Defendants' expert, Mr. Robert Aldir, testified to the same effect: "the buck stops" with the directors for everything that happens at the Bank. June 25 Trial Tr. 320:04-09. Mr. Crowell testified that the Bank has suffered losses up to $27.204 million resulting from Mr. Parker's actions and the actions of the other Defendants. June 18 Trial Tr. 14:12-14:17. These losses are attributable in part to the "extraordinary BSA expenses" that the Bank has had to incur as a direct result of the decision by Ms. Rodriguez to ██████████████████████████

██████████████████████████████████████ June 14 Trial Tr. 97:24-98:02; 103:01-107:12; P-004; P-005; P-006; P-298.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Mr. Parker on Plaintiffs' breach of fiduciary duty of loyalty and good faith claim. Judgment as a matter of law is therefore appropriate.

**5.    Breach of Fiduciary Duty of Loyalty and Good Faith Against Gustavo Macias**

Plaintiffs needed to prove that Defendant Gustavo Macias: (1) breached her fiduciary duty of loyalty and good faith; and (2) this breach was the proximate cause of the Bank's damages. *Gracey*, 837 So. 2d at 353. As to the first contested element, Plaintiffs have put forward clear and overwhelming proof that Mr. Macias breached his fiduciary duty of loyalty and good faith. Much like Mr. Parker, Mr. Macias decided to reward himself with the RSU Plan at a time when the Bank was losing millions annually, and did so without informing the Bank's minority shareholders. P-253; June 14 Trial Tr. 41:08-41:12. Mr. Crowell testified that Defendants, including Mr. Macias, "lacked independence" in carrying out their responsibilities as directors of ENB. June 18 Trial Tr. 13:25-14:02. Specifically regarding the directors' excessive compensation, Mr. Macias and the other Defendants "paid themselves excessive compensation that basically was a conflict of interest[.]" June 18 Trial Tr. 14:07-14:10. According to Mr. Crowell, Mr. Macias "put [his] personal interest ahead of the interest of Eastern National Bank." *Id.* Like Mr. Parker, Mr. Macias also approved a $150,000 salary increase for Mr. Rodriguez without conducting and documenting due diligence to support the decision. P-459.

As to the second element, Plaintiffs have proved that damage suffered by the Bank is directly attributable to Mr. Macias' breach of the duty of loyalty and good faith. As Mr. Macias testified, "[t]he Board is ultimately responsible for everything that happens to a bank." June 25 Trial Tr. 160:19-161:01; Defendants' expert, Mr. Robert Aldir, testified to the same effect: "the buck stops" with the directors for everything that happens at the Bank. June 25 Trial Tr. 320:04-

09. Mr. Macias and the other Defendants have caused losses to the Bank up to $27.204 million, according to Mr. Crowell. June 18 Trial Tr. 14:12-14:17. Because of Mr. Macias' actions, including agreeing to open the Banco de Venezuela correspondent account, the Bank has had to incur "extraordinary BSA expenses[.]" June 14 Trial Tr. 97:24-98:02; 103:01-107:12; P-004; P-005; P-006; P-298.

This evidence, along with myriad other proof in the record, demonstrates that no reasonable jury, properly instructed, could find for Mr. Macias on Plaintiffs' breach of fiduciary duty of loyalty and good faith claim. Judgment as a matter of law is therefore appropriate.

    **D.**    **JUDGMENT AS A MATTER OF LAW ON DEFENDANTS' DEFENSES SHOULD BE GRANTED.**

As of the close of evidence, Defendants' latest proposed jury instructions include instructions for only three affirmative defenses: (1) unclean hands, (2) statute of limitations, and (3) intervening/superseding cause. Plaintiffs move for judgment as a matter of law on each of these defenses and seek to exclude an instruction on each respective defense from the jury instructions.

Next, though not an affirmative defense, Defendants argue that all of Plaintiffs' claims should be dismissed because of the business judgment rule. As Judge Torres has already held, the business judgment rule (1) does not apply to shield Defendants from self-dealing and breaches of the duty of loyalty, and (2) the question of whether Defendants' actions constituted breaches or exercises of business judgment is a question for the fact-finder. Dkt. 361 at 4-6. As set forth more fully below, Plaintiffs contend that a reasonable jury, properly instructed, could not find that Defendants' actions are protected by the business judgment rule such that judgment should be granted as a matter of law.

Finally, Defendants' decision not to request an instruction on their other defenses should be deemed an abandonment of the issue pursuant to Fed. R. Civ. P. 51, and judgment as a matter of law is appropriate on that ground alone. Nevertheless, out of an abundance of caution and in anticipation that Defendants may seek to reassert these defenses before the jury is instructed, Plaintiffs move for judgment as a matter of law on all live defenses in Defendants' answer, as set forth below.

### 1.       Unclean Hands

The defense of "unclean hands" is an equitable defense "much like fraud." *U.S. Bank Nat'l Ass'n v. v. Qadir*, 342 So. 3d 855, 859 (Fla. Dist. Ct. App. 2022). It can be applied "to bar an equitable claim no matter the claim's merits when the plaintiff has engaged in some manner of unscrupulous conduct, overreaching, or trickery that would be condemned by honest and reasonable men." *Id.* (quoting *Roberts v. Roberts*, 80 So. 2d 717, 720 (Fla. 1956)). To assert a defense of unclean hands, Defendants were required to prove not only "condemnable conduct" by Plaintiffs, but also the following three additional elements: "(1) reliance on the conduct; (2) relation to the litigation; (3) resulting in an injury." *Qadir*, 342 So. 3d at 859.

But the Court need not reach the elements of unclean hands in this case, because the defense of "unclean hands" is inapplicable for multiple reasons. First, "unclean hands" is an *equitable* defense that only applies to *equitable* claims. "[T]he unclean hands doctrine traditionally only applies to equitable remedies and does not bar a plaintiff from recovering damages." *Royal Palm Properties, LLC v. Premier Est. Properties, Inc.*, No. 10-80232-CV, 2010 WL 3941745, at *2 (S.D. Fla. Oct. 6, 2010); *see also Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, No. 6:19-CV-1908-WWB-EJK, 2021 WL 4948122, at *4 (M.D. Fla. Oct. 7, 2021) (holding,

on Florida law claims, that "unclean hands doctrine forecloses a plaintiff's entitlement to equitable

relief").

Defendants attempt to apply an equitable defense to Plaintiffs' claim for legal relief.

However,

> [t]he guiding doctrine in this case is the equitable maxim that 'he who comes into
> equity must come with clean hands.' This maxim is far more than a mere banality.
> It is a self-imposed ordinance that closes the doors of a *court of equity* to one tainted
> with inequitableness or bad faith relative to the matter in which he seeks relief,
> however improper may have been the behavior of the defendant. That doctrine is
> rooted in the historical concept of *court of equity* as a vehicle for affirmatively
> enforcing the requirements of conscience and good faith. This presupposes a refusal
> on its part to be 'the abetter of iniquity.'

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (emphasis

added). The "unclean hands" doctrine applies specifically to equitable claims because "[e]quity is

a court of conscience; it demands fair dealing in all who seek relief[.]" *Epstein v. Epstein*, 915 So.

2d 1272, 1275 (Fla. Dist. Ct. App. 2005) (quoting *Schetter v. Schetter*, 279 So.2d 58, 61 (Fla. Dist.

Ct. App. 1973)). "An obviously sensible application of this principle is to withhold an equitable

remedy that would encourage, or reward (and thereby encourage), illegal activity, as where the

injunction would aid in consummating a crime[.]" *Cong. Park Off. Condos II, LLC v. First-Citizens*

*Bank & Tr. Co.*, 105 So. 3d 602, 609 n.6 (Fla. Dist. Ct. App. 2013) (quoting *Shondel v. McDermott*,

775 F.2d 859, 867 (7th Cir. 1985)). Florida courts have applied the doctrine of unclean hands in

suits seeking equitable relief, including foreclosure proceedings, requests for equitable liens, and

specific performance. *Id.* at 605 (foreclosure proceeding); *Epstein*, 915 So. 2d at 1274-75

(equitable lien); *Buttner v. Talbot*, 784 So. 2d 538, 541 (Fla. Dist. Ct. App. 2001), *cause dismissed*,

817 So. 2d 845 (Fla. 2002) (specific performance). The "unclean hands" doctrine affects whether

a party can "assert a right in equity." *Cong. Park Off. Condos*, 105 S0. 3d at 609. Breach of

fiduciary duty, however, is not an equitable claim. *Romano v. John Hancock Life Ins. Co. (USA)*,

26

No. 19-21147-CIV, 2021 WL 949939, at *2 (S.D. Fla. Mar. 12, 2021).[5] Therefore, the "unclean hands" doctrine is not a defense to Plaintiffs' claims that Defendants breached their fiduciary duties to the Bank.

In any event, even if the Court were to apply the evidence to the elements of the defense (which it need not), Defendants have put forward no evidence that Plaintiffs have come into this proceeding with unclean hands. For these reasons, the Court should therefore grant judgment as a matter of law on this defense and must not submit the issue to the jury.

## 2.    Statute of Limitations

Defendants failed to put forward any evidence that the statute of limitations bars Plaintiffs' claims. As a result, there is no legally sufficient evidence to support the contention that the limitations period for Plaintiffs' claims has already expired, and the issue must not be submitted to the jury.

A "cause of action cannot be said to have accrued ... until an action may be brought." *Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, 784 F.3d 771, 778 (11th Cir. 2015), *opinion after certified question answered*, 844 F.3d 944 (11th Cir. 2016). Consequently, a "cause of action accrues or begins to run when the last element of the cause of action occurs." *Davis v. Monahan*, 832 So. 2d 708, 709 (Fla. 2002). One of the elements of breach of fiduciary duty is that the breach proximately caused damage to Plaintiffs. *Gracey*, 837 So. 2d at 353. As such, claims for breach of a fiduciary duty are subject to a four-year statute of limitations, "which begins to run after the breach and resulting damages have occurred." *Am. Home Assur. Co. v. Weaver Aggregate Transp.,*

---

[5] An action for monetary damages is generally considered legal, not equitable, unless the remedy sought has "attributes that must be present before [a court] will find an exception to the general rule and characterize damages as equitable[.]" *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570 (1990). Damages have been characterized as equitable "where they are restitutionary" or they are "incidental to or intertwined with injunctive relief"—e.g., an award of backpay under the Fair Labor Standards Act. *Id.*

*Inc.*, 990 F. Supp. 2d 1254, 1271 (M.D. Fla. 2013); *Goodwin v. Sphatt*, 114 So. 3d 1092, 1094

(Fla. Dist. Ct. App. 2013); Fla. Stat. § 95.11(3)(o). Defendants have the burden of establishing that

Plaintiffs' claims are barred by the statute of limitations. *Elmore v. Fla. Power & Light Co.*, 895

So. 2d 475, 478 (Fla. Dist. Ct. App. 2005); *Brexendorf v. Bank of Am., N.A.*, 319 F. Supp. 3d 1257,

1262 (M.D. Fla. 2018).

Plaintiffs filed their Complaint against Defendants on January 14, 2022. Dkt. 1. Therefore,

Plaintiffs are within the limitations period if the damage occurred on or after January 14, 2018. It

is immaterial that Defendants chose to open the Banco de Venezuela correspondent account in

2017, or that any of their other breaches occurred prior to January 14, 2018. The limitations period

does not begin to run upon the occurrence of a breach alone. There must be a resulting injury. Fla.

Stat. § 95.031(1) ("A cause of action accrues when the last element constituting the cause of action

occurs.").

Even though the burden is on Defendants to prove that a claim is barred by the statute of

limitations, Plaintiffs have put forward clear evidence that the Bank's injuries resulting from the

breaches began to manifest in 2018.  Ms. Rodriguez testified that the Bank has been losing money

every year *starting in* 2018.  June 10 Trial Tr. 110:18-111:25; P-136; P-266.  Defendants have also

repeatedly testified that the Banco de Venezuela account yielded positive earnings in 2017—often

pointing to the Stipulated Fact that the Bank earned $203,000 in profit that year.  DE 345 at ¶ 37.

Conversely, Defendants have not put forward any evidence that the damage caused by their

conduct occurred prior to January 14, 2018. Consequently, there is no evidentiary basis on which

a jury could find that Plaintiffs' claims are barred by Florida's statute of limitations.  The Court

should therefore grant judgment as a matter of law on this defense and decline to submit the issue

to the jury.

### 3.      Injury Caused by Intervening/Superseding Acts

Defendants did not put forward any evidence of an intervening or superseding act that would have caused the Plaintiffs' harm. Without such evidence, there is no legally sufficient basis upon which a reasonable jury could find for Defendants on this argument.

One of the elements of a breach of fiduciary duty claim is causation—the damage done to Plaintiffs must have been "proximately caused" by the Defendants' breach. *Gracey*, 837 So. 2d at 353. Damage is "proximate in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 982 (Fla. 2018); *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1224 (11th Cir. 2021). An "independent, unforeseeable intervening force, however, may serve to break the causal link and extinguish liability." *Letzter v. Cephas*, 792 So. 2d 481, 485 (Fla. Dist. Ct. App. 2001).

In order for an act to be considered an intervening or superseding cause of the damages to Plaintiffs, it must have been "independent of the original negligence, and it must not be set in motion by the original negligence." *Cooke v. Nationwide Mut. Fire Ins. Co.*, 14 So. 3d 1192, 1195 (Fla. Dist. Ct. App. 2009). The intervening cause must also have been later in time than the Defendants' conduct. *Pope v. Pinkerton-Hays Lumber Co.*, 120 So. 2d 227, 230 (Fla. Dist. Ct. App. 1960). The conduct must also have been "unforeseeable" to Defendants. *Cooke*, 14 So. 3d at 1195; *Townsend v. Westside Dodge, Inc.*, 642 So. 2d 49, 50 (Fla. Dist. Ct. App. 1994). A tortfeasor can still be liable, despite an intervening cause, if that intervening cause was foreseeable. *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1116 (Fla. 2005). "The question of whether an intervening cause is foreseeable is for the trier of fact." *Id.* While an intervening cause can impact causation, it should be noted that this standard does not apply "as stringently" to intentional torts

and breach of fiduciary duty claims. *Tardif v. People for Ethical Treatment of Animals*, 829 F. Supp. 2d 1219, 1233 (M.D. Fla. 2011), *on reconsideration in part*, No. 2:09-CV-537-FTM-29, 2011 WL 6004071 (M.D. Fla. Dec. 1, 2011).

Defendants have claimed that the actions by Banco de Venezuela to overwhelm ENB by flooding the Bank with transactions, allegedly outside the scope of their agreement, is an intervening cause that negates proximate cause. This theory fails for a number of reasons. First, an intervening cause must be unforeseeable to Defendants. The intervening cause must "seem to the judicial mind highly unusual, extraordinary, bizarre, or, stated differently, seem beyond the scope of any fair assessment of the danger" that Defendants created. *Cooke*, 14 So. 3d at 1196 (quoting *Dep't of Transp. v. Anglin*, 502 So. 2d 896, 899 (Fla. 1987)). If a court is going to remove the issue of proximate cause from the jury, it should be "so far beyond the realm of foreseeability that, as a matter of law and policy, [Defendants] cannot be held liable for [Plaintiffs'] injuries." *Id.* There is clear evidence that Defendants did foresee or should have foreseen this risk. First, Jack Lantz warned them about the risks of opening the Banco de Venezuela correspondent account. He specifically warned Defendants that the "anticipated volumes" of transactions was a concern, and that the Bank did not have "the BSA and operations infrastructure to satisfactorily manage these transactions." P-041. Mr. Lantz told Defendants prior to opening the account that he didn't "believe there [was] any way to limit or control the expected volumes that have been provided." *Id.* In addition to Mr. Lantz's warnings, Defendants should have foreseen that the Banco de Venezuela account would overwhelm the Bank because it was a state-owned bank of a sanctioned regime, because Banco de Venezuela was used to deal with major banks like CitiBank, and because no other bank appeared willing to open a correspondent account for Banco de Venezuela. Exec.

Order No. 13,692; P-553 (describing Banco de Venezuela as an instrumentality of the Venezuelan Government); June 11 Trial Tr. 91:04-91:16, 99:20-99:25.

In addition to the requirement that an intervening cause be foreseeable, it also must be "completely independent" of Defendants' breaches. *Serrano v. Dickinson*, 363 So. 3d 162, 166 (Fla. Dist. Ct. App. 2023). A tortfeasor cannot escape liability by citing an intervening cause that was "set in motion" by their own breaches. *Id.* In the present case, Plaintiffs have proved Defendants breached their fiduciary duties by opening the Banco de Venezuela correspondent account. That decision by Defendants directly set in motion the intervening cause that Defendants now cite. As a result, Defendants have not put forward any evidence of an intervening cause that was both unforeseeable and completely independent of their own conduct, and judgment as a matter of law is required.

Finally, the Court must decline to instruct the jury on this defense—particularly with respect to posing a verdict form question on the matter—because intervening/superseding cause is not an affirmative defense. Plaintiffs have identified no case law in which the defense was characterized as an affirmative defense that would invite a separate question and finding from the jury. Defendants may argue that Plaintiffs failed to put on evidence of a causal link between Defendants' actions and Plaintiffs' economic injuries, but they must not be allowed to submit a potentially confusing and erroneous instruction and verdict form question on this defense.

### 4.  Business Judgment Rule

Defendants cannot plausibly argue that Plaintiffs have failed to put on legally sufficient evidence to overcome the application of the business judgment rule.  As such, there is no legally sufficient basis upon which a reasonable jury could find that the business judgment rule shields Defendants from liability.

Under the business judgment rule, the Court is to "presume that [corporate] directors have acted in good faith." *In re Bal Harbour Club, Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003). The purpose of the rule is to prevent a factfinder from "using hindsight to second-guess directors' business decisions." *Kloha v. Duda*, 246 F. Supp. 2d 1237, 1244 (M.D. Fla. 2003). However, the business judgment rule is inapplicable to breaches of the fiduciary duty of loyalty. *Fed. Deposit Ins. Corp. as Receiver for Wakulla Bank v. Dodson*, No. 4:13-CV-416-MW-CAS, 2014 WL 11511068, at *7 (N.D. Fla. Feb. 27, 2014). As to Defendants' breach of the fiduciary duty of care, the presumption is a "limited" one. *Aerospace Accessory Serv., Inc. v. Abiseid*, 943 So. 2d 866, 867 (Fla. Dist. Ct. App. 2006). The presumption can be defeated upon a showing of "abuse of discretion, fraud, bad faith, or illegality." *Kloha*, 246 F. Supp. 2d at 1244; *see also* Fla. Stat. § 607.0831(1). Plaintiffs have proved with overwhelming evidence that each of the Defendants abused their discretion as directors and acted in bad faith.

In addition, Florida statute provides that a director can be liable for a breach of duty if the breach involves: (1) a "violation of the criminal law, unless the director had reasonable cause to believe his or her conduct was lawful or had no reasonable cause to believe his or her conduct was unlawful"; (2) a transaction from which the director derives "improper personal benefit, either directly or indirectly"; (3) an action involving unlawful distributions; (4) in a shareholder derivative suit, an action displaying "conscious disregard for the best interest of the corporation, or willful or intentional misconduct"; or (5) "[i]n a proceeding by or in the right of someone other than the corporation or a shareholder, an action "committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 607.0831(1)(b).

The overwhelming evidence put on throughout trial demonstrates that Defendants both derived improper personal benefits in their actions and that they had a conscious disregard for the best interest of the Bank on the part of each Defendant. As Judge Torres found, the business judgment rule does not bar Plaintiffs' claims, and the disputed facts on whether Defendants should be held liable for breach of fiduciary duty should be left to the jury.  DE 361 at 4-6.

### 5.      Laches, Waiver, Equitable Estoppel, and Unclean Hands

Defendants failed to produce any evidence at trial to support the application of laches, waiver, or equitable estoppel as affirmative defenses. As such, there is no legally sufficient basis upon which a reasonable jury could find for Defendants on any of these arguments. Further, not only did Defendants fail to put on legally sufficient evidence of these defenses, but certain defenses are inapplicable as a matter of law and must not be submitted to the jury.

**Laches.**  Like Defendants' unclean hands defense, laches is not available as a defense to a breach of fiduciary duty claim. Laches is also an affirmative defense to claims for equitable relief. "Laches is principally a question of the inequity of permitting a claim to be enforced by equitable remedies in the face of a change in the conditions or relations of the parties occasioned by a delay that works a disadvantage to him against whom equitable relief is sought. When a court of equity sees negligence on one side and injury therefrom on the other, it is ground for denial of equitable relief." *Friend v. Kapchuk*, 216 So. 2d 783, 784-85 (Fla. Dist. Ct. App. 1968) (quoting *Smith v. Daffin*, 115 Fla. 418, 425, 155 So. 658, 661 (1934)). "[L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation. [. . .] Both before and after the merger of law and equity in 1938, this Court has cautioned against invoking laches to bar legal relief." *Petrella*

*v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014).  Accordingly, the Court should grant judgment as a matter of law on this legal ground.

But even if the Court were to consider the application of the evidence, Defendants have failed to put on legally sufficient evidence of the defense.  To invoke the equitable doctrine of laches, Defendants had to prove that there was an "unreasonable delay in asserting a known right which causes undue prejudice to the party against whom the claim is asserted." *Gratkowski v. ASI Preferred Ins. Corp.*, 351 So. 3d 1216, 1221 (Fla. Dist. Ct. App. 2022). The defense of laches required proof of the following four elements: "(1) conduct by the defendant that gives rise to the complaint; (2) that the plaintiff had knowledge of the defendant's conduct and did not assert the opportunity to institute suit; (3) lack of knowledge by the defendant that the plaintiff will assert the right upon which suit is based; and (4) extraordinary injury or prejudice." *Holley v. Erwin-Jenkins*, 369 So. 3d 1218, 1223 (Fla. Dist. Ct. App. 2023) (quoting *Ticktin v. Kearin*, 807 So. 2d 659, 664 (Fla. Dist. Ct. App. 2001)); *Encore Enterprises, Inc. v. Roberts Hotels Fort Myers, LLC*, No. 2:09-CV-118-FTM-36, 2011 WL 5357533, at *5 (M.D. Fla. Oct. 31, 2011) (applying laches standard under Florida law to claims arising under state law). Defendants have the burden of proving laches "by very clear and positive evidence." *Holley*, 369 So. 3d at 1223 (quoting *Van Meter v. Kelsey*, 91 So. 2d 327, 332 (Fla. 1956)). Defendants put forward no evidence at trial that Plaintiffs unreasonably delayed in asserting their rights or that Defendants have suffered any "undue prejudice."

**Waiver.** "Waiver is the intentional relinquishment of a known right." *Bueno v. Workman*, 20 So. 3d 993, 998 (Fla. Dist. Ct. App. 2009). In order for waiver to apply here, Defendants needed to prove the following elements: "(1) the existence of a right which may be waived; (2) actual or constructive knowledge of the right; and (3) the intent to relinquish the right." *Id.* (quoting *LeNeve*

*v. Via S. Fla., L.L.C.*, 908 So. 2d 530, 535 (Fla. Dist. Ct. App. 2005)). "[I]n order for a party's representations to constitute a waiver, the waiving party must possess all of the material facts." *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1330 (S.D. Fla. 2010), *aff'd*, 477 Fed. App'x 702 (11th Cir. 2012) (citing *L.R. v. Dep't of Children & Families*, 822 So. 2d 527, 530 (Fla. Dist. Ct. App. 2002)). Defendants did not present any evidence at trial that Plaintiffs *intentionally* relinquished their claims that Defendants breached their fiduciary duties to the Bank or the Bank's right to recover damages resulting from these breaches.

**Equitable Estoppel.** Defendants did not provide any evidence in support of equitable estoppel, which operates to prevent a party from "unfairly assert[ing] inconsistent positions," but only if the party seeking estoppel was "misled." *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1103 (Fla. Dist. Ct. App. 2006). The logic behind equitable estoppel is that "[o]ne who assumes a particular position or theory in a case is judicially estopped in a later phase of that same case, or in another case, from asserting any other or inconsistent position toward the same parties and subject matter." *In re Adoption of D.P.P.*, 158 So. 3d 633, 639 (Fla. Dist. Ct. App. 2014). The elements of an equitable estoppel defense are: "(1) a representation as to a material fact that is contrary to a later-asserted position; (2) reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon." *Dep't of Revenue ex rel. Thorman v. Holley*, 86 So. 3d 1199, 1203-04 (Fla. Dist. Ct. App. 2012). Defendants did not put forward any evidence of "inconsistent positions" that Plaintiffs have taken. As a result, there is no basis to support the application of equitable estoppel in this case.

**6.      Barred by Plaintiff's Own Actions, Omissions, and/or Negligence**

Defendants did not provide any evidence of Plaintiffs' own actions, omissions, or negligence sufficient to overcome Defendants' own liability. There is no legally sufficient basis upon which a reasonable jury could find for Defendants on this argument.

Under Florida law, "contributory fault chargeable to the [Plaintiffs] diminishes proportionately the amount awarded as economic and noneconomic damages for an injury attributable to the [Plaintiffs'] contributory fault, but does not bar recovery[.]" Fla. Stat. § 768.81(2).[6] Comparative negligence can be applied to claims of gross negligence. *Agudelo v. Padron*, No. 18-22612-CIV, 2019 WL 13182381, at *3 (S.D. Fla. Aug. 26, 2019). However, comparative negligence cannot be used to reduce damages or bar a claim arising out of intentional conduct. *Smith v. R.J. Reynolds Tobacco Co.*, 880 F.3d 1272, 1280 (11th Cir. 2018); *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 305 (Fla. 2017).

Defendants have not put forward evidence that Plaintiffs are partially responsible for the injuries that they have otherwise proved. Even if Defendants had put forward evidence of Plaintiffs' comparative fault, Plaintiffs would still be entitled to judgment as a matter of law because Plaintiffs have proved that Defendants breached their fiduciary duties to the Bank, and that Breach was the proximate cause of injury to the Bank. Indeed, given that this is a shareholder derivative dispute brought on behalf of the Bank, it would be non-sensical for Defendants to argue that the Bank (the ultimate recipient of any damages awarded) was responsible for any damages it suffered as a result of Defendants' breaches of the fiduciary duties to it. Accordingly, comparative

---

[6] Since the filing of this suit, the Florida Legislature has enacted a change to the comparative negligence statute, barring recovery if the plaintiff is "found to be greater than 50 percent at fault for his or her own harm[.]" 2023 Fla. Sess. Law Serv. Ch. 2023-15 (West). This change went into effect on March 24, 2023 and, as a result, does not apply to the facts of this case, which all occurred prior to that date.

fault does not bar or reduce recovery for Defendants' conduct, and this defense must not be presented to the jury.

### 7.     Damages Are Too Speculative or Remote

Defendants did not produce any evidence at trial that could prove that Plaintiffs' damages are too speculative or remote to ascertain with reasonable certainty. There is no legally sufficient basis upon which a reasonable jury could find for Defendants on this argument.

Florida law allows recovery of "all damages which are a natural, proximate, probable or direct consequence of the act, but do not include remote consequences." *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1344 (S.D. Fla. 2006), *aff'd*, 294 Fed. App'x 501 (11th Cir. 2008) (quoting *Taylor Imp. Motors, Inc. v. Smiley*, 143 So. 2d 66, 67-68 (Fla. Dist. Ct. App. 1962)). Courts have refused to award damages that are "too speculative or remote" if Plaintiff did not "provide evidence to calculate damages to a reasonable certainty." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, No. 16-21203-CIV, 2018 WL 10322164, at *5 (S.D. Fla. Jan. 13, 2018); *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213 (11th Cir. 2006).  At trial, Mr. Crowell was qualified as an expert and testified about his methodology for collecting data and calculating damages in a straightforward application of addition.  Mr. Aldir, Defendants' damages expert, admitted that Mr. Crowell's calculation of damages—which was the sum of the Bank's net income losses from 2018 to present—were accurate and that he had no reason to dispute the data or calculation. Accordingly, judgment as a matter of law should be granted on this defense.

### 8.     Failure to Mitigate Damages

Defendants produced no evidence that Plaintiffs failed to mitigate damages and are thus not entitled to recovery. There is no legally sufficient basis upon which a reasonable jury could find for Defendants on this argument.

"The doctrine of avoidable consequences, which is also somewhat inaccurately identified as the duty to mitigate damages, commonly applies in contract and tort actions." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009). There is no actual *duty* imposed, as "the injured party is not compelled to undertake any ameliorative efforts." *Id.* However, the doctrine of avoidable consequences "prevents a party from recovering those damages inflicted by a wrongdoer that the injured party *could have* reasonably avoided." *Id.* (emphasis in original).

Plaintiffs were not required to have made "Herculean efforts" to mitigate the harm caused by Defendants. *Id.* (citing *Thompson v. Fla. Drum Co.*, 651 So. 2d 180, 182 (Fla. Dist. Ct. App. 1995)). "Rather, the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through ordinary and reasonable care, without requiring undue effort or expense." *Id.* (citing *Graphic Assocs., Inc. v. Riviana Rest. Corp.*, 461 So. 2d 1011 (Fla. Dist. Ct. App. 1984)). And again, because this is a shareholder derivative dispute brought on behalf of the Bank, it would be non-sensical for Defendants to argue that the Bank (the ultimate recipient of any damages awarded) was responsible for mitigating damages it suffered as a result of Defendants' breaches of the fiduciary duties to it.  Accordingly, judgment as a matter of law should be granted on this defense.

> **9.** **Actions Reviewed, Authorized, Licensed, or Not Objected to by Regulators**

Defendants have failed to demonstrate that this Court lacks subject matter jurisdiction over this conduct simply on the basis that the evidence involves governmental enforcement by the OCC. The Court has already determined that it has jurisdiction over the present case and that Plaintiffs are able to pursue claims related to the OCC's Consent Orders. In denying Defendants' motion for summary judgment, the Court held that "Plaintiffs are not, as Defendants suggest, seeking to enforce the terms of a consent order through this litigation. [. . .] [T]he consent orders are woven

into the fabric of this case because they are evidence that the Defendants may have breached the fiduciary duties that they owe to the Bank." Dkt. 361 at 8.  In other words, Plaintiffs have put on ample evidence that Defendants breached their fiduciary duties to the Bank—in large part by undertaking the actions that gave rise to the 2018 and 2020 Consent Orders—such that Defendants should be held liable for economic damages to the Bank.  The Consent Orders, and actions surrounding them, are evidence of Defendants' breach, but Plaintiffs by no means are attempting to "enforce" the Consent Orders in the same way a government agency like the OCC would.

### 10.    Plaintiffs Do Not Adequately Represent Interests of Shareholders

Finally, the issue of whether Plaintiffs have standing to bring these claims as shareholders has been repeatedly and definitively resolved by this Court. Dkt. 454. At trial, Plaintiffs have put on ample evidence that they are the minority shareholders of the Bank. Indeed, Defendants admitted into evidence Plaintiffs' votes from shareholder meetings. Accordingly, judgment as a matter of law must be granted against this defense.

## III.    CONCLUSION

Plaintiffs have presented evidence from which a reasonable jury could only find for Plaintiffs on both claims brought against each of the Defendants. Defendants have failed to produce evidence that would bar or limit Plaintiffs' recovery. Defendants have further not put on legally sufficient evidence of any of their defenses, some of which are inapposite as a matter of law regardless of the evidence.  Plaintiffs accordingly request that the Court enter judgment as a matter of law in their favor on both claims against Defendants, and award damages against each Defendant for their respective breaches.

Dated: June 26, 2024                    Respectfully submitted,

<u>**Diego Pérez Ara**</u>
Derek E. León
Florida Bar No. 625507
Diego Pérez Ara
Florida Bar No. 1023765
**LEÓN COSGROVE JIMÉNEZ, LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: 305.740.1975
Facsimile: 305.351.4059
Email: dleon@leoncosgrove.com
Email: dperez@leoncosgrove.com
Email: eperez@leoncosgrove.com

Heaven C. Chee (*pro hac vice*)
**LEÓN COSGROVE JIMÉNEZ, LLP**
700 Louisiana Street, Suite 5300
Houston, Texas 77002
Telephone: 346.250.5660
Facsimile: 305.351.4059
Email: hchee@leoncosgrove.com

*Counsel for Plaintiffs*